John T. JOYCE, Trustee of the Bricklayers and Trowel Trades International Pension Fund, et al., Appellants,

v.

CLYDE SANDOZ MASONRY, d/b/a Griffith Masonry.

No. 88–7063.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1989.

Decided March 31, 1989.

Ira Mitzner, with whom George Kaufmann, Washington, D.C., was on the brief, for appellants.

Guy David Knoller, for appellee.

Gary M. Ford, Washington, D.C., Carol Connor Flowe and Peter H. Gould, Washington, D.C., were on the brief for amicus curiae, urging reversal.

Before STARR, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This appeal requires us to determine whether a statutory time limitation bars a pension fund's suit to compel payments from an employer. The pension fund seeks relief under the Multiemployer Pension Plan Amendments Act ("MPPAA" or "Act"), which amended the Employee Retirement Income Security Act (ERISA)[1] to establish that participating employers who cease contributing to a covered pension fund are, in certain circumstances, liable to the fund for "withdrawal liability." The Act establishes a limitations period for bringing claims to recover payment of withdrawal liability. *See* 29 U.S.C. § 1451(f).

In the case before us, the trustees ("plan sponsors") of the Bricklayers and Trowel Trades International Pension Fund ("Fund") filed suit in federal district court

---

1. The Employee Retirement Income Security Act of 1974, Pub.L. 93–406, 88 Stat. 829 (codified in relevant part at 29 U.S.C. §§ 1001–1381 (1982 & Supp. IV 1986)), *as amended by* The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. 96–364, 94 Stat. 1208 (codified in relevant part at 29 U.S.C. §§ 1381–1461 (1982 & Supp. IV 1986)).

to recover withdrawal liability from Clyde Sandoz Masonry, Inc., alleged to be doing business as Griffith Masonry, Inc. ("Sandoz" or "Sandoz Masonry").[2] The sponsors brought the action, however, considerably after the employer's complete withdrawal from the fund. The plan sponsors appeal the District Court's determination that the employer's complete withdrawal from the plan had triggered the operation of section 1451's limitations provision, which the trial court held barred the plan sponsors' suit. For reasons that we shall presently set forth, we agree that section 1451's limitations period does not bar the plan sponsors' suit.

## I

The intersection of (1) the complicated statutory scheme governing collection of employers' withdrawal liability and (2) the plan sponsors' delay in pursuit of that collection in this case produces the conflict before us. Each aspect requires elaboration.

## A

ERISA, as amended by the MPPAA, provides an elaborate system to ensure the financial integrity of multiemployer pension funds. *See generally, Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). Congress passed the MPPAA in part because employers' withdrawals from multiemployer pension plans threatened those plans' solvency, and thus their ability to ensure that beneficiaries would ultimately receive benefits that were their due. *See, e.g., Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 213–17, 106 S.Ct. 1018, 1020–22, 89 L.Ed.2d 166 (1986); *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 721–25, 104 S.Ct. 2709, 2713–16, 81 L.Ed.2d 601 (1984); *I.A.M. Nat'l Pension Fund, Plan A v. Clinton*

*Engines Corp.,* 825 F.2d 415, 416–17 (D.C. Cir.1987).

The Act requires employers who cease contributing to a multiemployer fund to pay what the statute refers to as "withdrawal liability," a sum that represents a portion of the fund's "unfunded vested benefits." *See* 29 U.S.C. §§ 1381, 1399; *see also Connolly,* 475 U.S. at 216–17, 106 S.Ct. at 1021–22. That sum is based upon the employer's date of "complete withdrawal" from a multiemployer plan. *See id.* §§ 1383, 1391. Special provisions define the "complete withdrawal" of employers, like Sandoz, engaged in the construction and building trades. *See id.* § 1383(b).

The MPPAA grants the plan sponsor broad authority to assess and collect withdrawal liability. The Act requires that the fund "[a]s soon as practicable after an employer's complete ... withdrawal" (1) calculate the employer's withdrawal liability, (2) set forth a schedule of payments, and (3) demand that the employer make payments pursuant to that schedule. *See id.* § 1399(b)(1). Those plan determinations are entitled to substantial deference in subsequent arbitration proceedings. *See id.* § 1401(a)(3). If no arbitration has been initiated within the prescribed period, the amounts demanded are "due and owing on the schedule set forth by the plan sponsor" and subject to a plan sponsor's suit for collection. *Id.* § 1401(b)(1). If the employer fails within 60 days to meet a payment (following notice of that failure), section 1399(c)(5)(A) deems the employer to be in default and allows the plan sponsor to "require immediate payment of the outstanding amount of an employer's withdrawal liability." *See id.* § 1399(c)(5).

The parties are in dispute as to the time bar upon plan sponsor suits to collect withdrawal liability. Section 1451, which governs civil actions for withdrawal liability, provides that "[a] plan fiduciary, employer, plan participant, or beneficiary, who

---

**2.** In other proceedings, but not before this court for relevant purposes, the parties contest the nature of the relationship between Clyde Sandoz Masonry, Inc. and Griffith Masonry, Inc. Without passing upon that issue and for the

sake of convenience, we refer to the party/parties against which the plan sponsors claim and which may owe withdrawal liability as "Sandoz" or "Sandoz Masonry."

is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan ... may bring an action for appropriate legal or equitable relief, or both." *Id.* § 1451(a)(1). The same section contains the limitations provision, the meaning of which is pivotal to this case:

> An action under this section may not be brought after the later of—
>
>   (1) 6 years after the date on which the cause of action arose, or
>
>   (2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.

*Id.* § 1451(f).

### B

From 1977 until June 30, 1981, when the collective bargaining agreement between Sandoz and the bricklayers' union expired, Sandoz contributed to the Fund in accordance with that agreement. For some days thereafter, the parties negotiated over a new agreement, but on July 16, 1981 Sandoz implemented its final offer to the union. That offer did not include an obligation to contribute to the Fund. J.A. at 6. In August 1981, Sandoz filed a report and made payments to the Fund for work performed during the period from July 1 to July 15, 1981. *Id.* at 4. Sandoz made no subsequent contributions to the Fund, but did submit monthly reports "for at least 4 years." Brief for Appellee at 2.

In December 1986, Sandoz elected to dissolve; in March 1987, the corporation ceased doing business and had its contractor's license cancelled. Griffith Masonry, Inc., was incorporated in January 1987, and obtained its contractor's license in March 1987. *See supra* n. 2.

In June 1987, while attending a local union meeting in Arizona, a Fund director received information that prompted the Fund to investigate whether Sandoz had completely withdrawn from the plan. The Fund sent notice to Sandoz of its withdrawal liability on July 13, 1987, and provided a payment schedule. On the same day, the Fund filed suit in District Court to collect the entire amount of withdrawal liability. On October 8, 1987, the Fund informed Sandoz that Sandoz had failed to make the first scheduled payment of withdrawal liability, and thus would be in default if the failure were not cured within 60 days. Sandoz made no withdrawal liability payments.

By order of January 19, 1988, the District Court dismissed the Fund's complaint. The court held that section 1451(f)'s six-year time bar ran from the date of the employer's complete withdrawal, which the court determined to be the expiration date (June 30, 1981) of the collective bargaining agreement.[3] J.A. at 17–18. With the

---

**3.** The District Court reasoned that the employer "cease[d] to have an obligation to contribute" (a crucial predicate to determining the date of complete withdrawal, *see* 29 U.S.C. § 1383(a), (b)(2)(A)) upon the termination of the collective bargaining agreement rather than upon impasse. J.A. at 17. The court also concluded that in any case only the National Labor Relations Board could determine impasse and any pre-impasse obligation to contribute. *Id.* at 18.

Both elements of this reasoning were, with all respect, flawed. First, impasse rather than expiration or termination of the collective bargaining agreement marks the cessation of the employer's obligation to contribute. The obligation to contribute arises under a collective bargaining agreement or "as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). One elementary duty under applicable law is to bargain in good faith—a duty which has been interpreted to require, among other things, that the employer adhere to the terms of the collective bargaining agreement after the agreement's expiration but before the parties have negotiated to impasse. *See, e.g.,* 29 U.S.C. § 158(a)(5) (the duty to bargain collectively); *Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 108 S.Ct. 830, 833 n. 6, 834, 98 L.Ed.2d 936 (1988); *NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). The obligation to contribute thus continues until impasse.

Second, arbitrators and trial judges must assess impasse in cases such as the one before us to determine when the employer's obligation to contribute ceased. *See Laborers Health and Welfare Trust Fund,* 108 S.Ct. at 837 n. 19

events so interpreted, the Fund had initiated its suit, filed July 13, 1987, beyond the six-year period allowed by section 1451. *Id.*

Joined by the Pension Benefit Guaranty Corporation (the government-owned entity that administers aspects of ERISA) as amicus curiae, the plan sponsors argue on appeal that, in this case, section 1451's time bar must be calculated from the time the employer fails to make a payment demanded by the Fund.

## II

The parties have narrowed their dispute to a single issue of statutory interpretation: What acts or omissions trigger section 1451(f)'s time bar as applied to efforts to collect withdrawal liability? The parties agree that this case is not directly governed by the discovery element of section 1451's time bar (section 1451(f)(2), limiting the action to when "the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action"), but rather by section 1451(f)(1)'s limitation of actions to "6 years after the date on which the cause of action arose." The ambiguity (and the heart of the case) lies in the phrase "cause of action."

As is appropriate in the interpretive enterprise, we first examine the statutory language. Section 1451(f), by its terms, governs any "action under this section," a phrase which points us to section 1451(a)'s provision for an action by "[a] plan fiduciary ... who is adversely affected by the act or omission of any party under this subtitle." A "cause of action" might thus be thought to arise upon the section 1451(a)(1) "act or omission." However, this recognition only brings us to the crux of the dispute; the parties differ sharply over what act or omission gives rise to the cause of action. Sandoz (supported by the

District Court) deems that act to be the employer's complete withdrawal; in contrast, the plan sponsors believe the relevant omission to be the employer's failure to meet the Fund's demand for payment.

### A

The statute, it seems to us, indicates that the plan is "adversely affected" (and thus that a "cause of action" arises) when the plan has not received payments which are due and owing. The language of the statute (including the terms of section 1451 itself) points firmly in the direction of the conclusion that Sandoz's uncured failure to pay the sum demanded adversely affected the plan, thus giving rise to a cause of action.[4] *See* 29 U.S.C. §§ 1399(c)(5), 1401(b). Additional support emerges in the statute's pervasive distinction between withdrawal liability and a plan's ability to receive payment of portions or the entirety of that sum.

*First.* The statute's express terms link a plan's ability to pursue judicial relief to an employer's failure to meet a payment demanded by the plan. Most directly, section 1401(b)(1) provides:

> If no arbitration proceeding has been initiated ..., the amounts demanded by the plan sponsor under section 1399(b)(1) ... shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection.

Additionally, the Act indicates that when the employer is in "default," the "plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability." *Id.* § 1399(c)(5). "Default," for purposes of this case, occurs when the employer fails to make "any payment under this section, if the failure is not cured within 60 days after the employer

---

("[D]istrict courts may find it necessary to decide whether an impasse occurred in withdrawal liability cases in which there is a dispute over the date of withdrawal.").

**4.** Other concerns may govern consideration of when the plan is adversely affected by the employer's default, caused by reasons other than

the failure "to make, when due, any payment under this section." 29 U.S.C. § 1399(c)(5)(A); *see id.* § 1399(c)(5)(B) ("default" established by "any other event defined in the rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability").

receives written notification from the plan sponsor of such failure." *Id.* § 1399(c)(5)(A).[5] For both of these sections, the plan sponsor's demand for payment triggers the employer's obligation to pay, and the employer's failure to make the scheduled payment in turn provides the predicate for a plan sponsor's suit. That is to say, the failure to pay gives rise to a cause of action.

*Second.* The statute carefully distinguishes between the circumstances that define complete withdrawal and those which give rise to a cause of action. In the statutory scheme, the date of "complete withdrawal" functions to demarcate or to allow calculation of the employer's share, if any, of the plan's unfunded vested benefits. *See id.* § 1391. The statute directs the plan "[a]s soon as practicable after the employer's complete ... withdrawal" to calculate the employer's liability, notify the employer of the amount of the liability, set forth a schedule for liability payments, and then demand payment according to that schedule. *See id.* § 1399(b)(1).

So long as the employer does not default in payment, the plan is not harmed by the withdrawal (in the sense related to the redress the suit seeks, *see infra* p. 1124). Indeed, that result is the fundamental purpose and consequence of the MPPAA. By virtue of withdrawal alone (apart from the liability calculation and demand for payment), the employer is not immediately obligated to make payments, nor is the plan by virtue of withdrawal alone entitled to receive any such payments. Withdrawal, in itself, does not visit any adverse effect upon the plan that gives rise to the cause of action. *See id.* § 1451(a); *infra* p. 1124.

This case provides unusual evidence of how the date of complete withdrawal functions within the Act as the basis for calculating the amount of withdrawal liability, but does not itself immediately give rise to the employer's obligation to make (or, more to the point, the plan's entitlement to receive) payments of that liability. In the usual case,

> a complete withdrawal from a multiemployer plan occurs when an employer—
>
>> (1) permanently ceases to have an obligation to contribute under the plan, or
>>
>> (2) permanently ceases all covered operations under the plan.

29 U.S.C. § 1383(a). This determination cannot necessarily be made upon complete withdrawal; rather, it requires a post hoc determination of when a particular cessation of covered operations, for example, actually signaled a permanent halt to (rather than a lull in) operations. The peculiar nature of the construction industry, a peculiarity reflected in the Act, compounds this problem of uncertainty. For many employers in the building and construction industries, the employer's complete withdrawal may not occur unless the employer "ceases to have an obligation to contribute under the plan" and "resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." *Id.* § 1383(b)(2). That is, the plan sponsor (or any other party) may not be able to establish that the building or construction industry employer has completely withdrawn until as much as five

---

**5.** In this case, "default" occurred considerably after the plan sponsors filed this suit. Because the initial demand and schedule of payments accompanied notice of the July 13, 1987 filing of suit, Sandoz did not fail to meet its first scheduled payment until September 1987 and was not in default on the entire withdrawal liability until 60 days after the plan sponsors' subsequent notice of that September failure. *See* 29 U.S.C. § 1399(c)(5)(A); J.A. at 11–12; Transcript of Hearing on Motion to Dismiss 31–32, *Joyce v. Clyde Sandoz Masonry, Inc.,* Civ. No. 87–1894 (Dec. 16, 1987) [hereinafter "Tr."].

The plan sponsors defend their premature filing as an attempt to protect their claim in the event that section 1451(f) was held to be triggered by the employer's complete withdrawal (as the District Court in fact held). *See* Brief for Appellants at 5–6; Tr. at 31–32. While the sponsors' delay in demanding payment is unfortunate, intervening events have essentially cured the problem of premature filing for purposes of our consideration of the limitations issue. We see no unfair detriment to Sandoz in this conclusion. *But see infra* p. 1127 (Sandoz retains opportunity to challenge plan sponsors' demand as not made "[a]s soon as practicable").

years after what the parties eventually determine to have been the date of complete withdrawal. To conclude that an event requiring such a post hoc (and belated) determination triggers the limitations bar would create, at the least, an unwieldy statutory collection mechanism.

In sharp distinction to the date of complete withdrawal, the plan's unmet demand for payment operates rather differently. Quite simply, failure to meet the demand gives rise to the injury which the suit is designed to redress (and thus to a "cause of action"). Once the employer receives the plan's demand for payment, then (and only then) does the employer's obligation to pay arise. When, and only when, the employer fails to meet that demanded schedule of payments (and fails to cure that failure) has the plan been harmed (and thus becomes entitled to maintain its claim against the employer).

To return to the crucial statutory language: The plan is "adversely affected by the act or omission of any party ... with respect to a multiemployer plan," *id.* § 1451(a), only once it fails to receive the payment it has demanded and to which it is entitled. The employer's complete withdrawal, without more, is an occurrence that hardly affects the plan adversely, but merely sets in motion the usual (and routine) process of calculation, notification, schedule, possible request for review or arbitration, and payment. The employer's complete withdrawal is, to be sure, a predicate to the plan's demand for payment. But only an unmet demand removes a dispute from these routine occurrences in the world of the MPPAA and creates the special and distinct harm that casts the dispute into the traditional adversarial arena, an arena that might be thought to require a statutory limitations period upon suits seeking judicial relief.

Additionally, the Act recognizes that the plan has been "adversely affected" by an unmet demand upon the employer by making the demanded amount of withdrawal liability "due and owing." *Id.* §§ 1401(b), 1451. *Cf. United Retail & Wholesale Employees Teamsters Union Local No. 115*

*Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 132–34 (3d Cir.1986) (29 U.S.C. §§ 1399(c) and 1451 establish cause of action based upon adverse affect on plan of failure to receive demanded payment, even during pendency of arbitration), *aff'd by equally divided Court,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987). Upon default, the entire amount of withdrawal liability may be demanded, and thus become due and owing. The "act or omission" "adversely affect[ing]" the plan, of course, establishes when the cause of action arises. 29 U.S.C. § 1451.

Finally, we are heartened that other tribunals have with near uniformity favored the interpretation that we adopt today. *See, e.g., Korman Corp. v. Teamsters Pension Fund,* 10 Employee Benefits Cas. (BNA) 1608 (1988); *Ludington News Co. v. Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employers Joint Pension Fund,* 9 Employee Benefits Cas. (BNA) 1913 (1988). *But cf. Combs v. Western Coal Corp.,* 611 F.Supp. 917, 920 (D.D.C.1985) (in dictum, assuming without argument that time bar is calculated from withdrawal for purposes of laches analysis). Those cases, too, though without precedential effect in our circuit, have found relevant the distinction between withdrawal liability and an unmet demanded payment. *See Ludington News Co.,* 9 Employee Benefits Cas. (BNA) at 1916–18. Consequently, they, too, recognize that "only after demand is made *and* refused [do] the provisions of 29 U.S.C. [§ 1451(f) ] apply[,] for no cause of action arises until at least the Employer refuses to meet the demand of the Fund." *Korman Corp.,* 10 Employee Benefits Cas. (BNA) at 1615.

### B

The arguments advanced by Sandoz Masonry to support the competing interpretation (that the cause of action arises upon the employer's complete withdrawal from participation in the plan) are peculiarly unpersuasive.

First, Sandoz argues that the date of complete withdrawal establishes the time

when the cause of action arises, Brief for Appellee at 8, apparently because section 1383 (determining the date of complete withdrawal) gains relevance from section 1381's provision that, "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal . . ., then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381; *see id.* § 1383.

This argument, however, fails to distinguish between the concept of withdrawal liability (which section 1381 addresses) and the issue when a cause of action arises, thus triggering section 1451(f)'s application to a plan sponsor's suit to recover payments of that liability (which is, of course, the issue before the court). As we have examined at length, *see supra* pp. 9–12, the Act sharply distinguishes between the existence and amount of withdrawal liability, on the one hand, and, on the other, both the preconditions for maintaining a suit and "the act or omission" that "adversely affected" the plan. *See* 29 U.S.C. § 1451(a); *see also id.* §§ 1381, 1383, 1391, 1399. The nature of a cause of action and the terms of section 1451(a) indicate that only those last two concerns indicate when a cause of action arises, and in turn shape the operation of section 1451(f).

Second, Sandoz argues that the full language of the time bar supports its view of when a cause of action arises. *See* Brief for Appellee at 9. The employer claims that only its interpretation gives effect to section 1451(f)(2), the "discovery prong" of the time bar. *See* 29 U.S.C. § 1451(f) (requiring actions to be brought within the later of 6 years from the accrual of the cause or, as indicated in section 1451(f)(2), three years following discovery of the cause); *supra* p. 5. To link the cause of action to the failure to meet the plan sponsors' demand, Sandoz argues, assumes that the plan has discovered the withdrawal and thus would render meaningless section 1451(f)(2). *See* Brief for Appellee at 9.

This argument misconstrues the function of section 1451(f)'s time bar. If the bar applied only to plan sponsors' suits to collect delinquent withdrawal liability pay-

ments, the argument would carry some weight. However, the time bar applies to "[a]n action under this section." Section 1451, situated at the beginning of the subtitle part entitled "enforcement," is hardly limited to the type of suit before us. Instead, section 1451 applies to suits brought by a wide variety of parties. *See* 29 U.S.C. § 1451(a)(1) ("A plan fiduciary, employer, plan participant, or beneficiary who is adversely affected . . ., or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both."). Additionally, the section applies to recovery by a party "adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan." *Id.* That subtitle, 29 U.S.C. §§ 1381–1453 (governing, among other things, employer withdrawals, transfers of plan assets, reorganizations of plans, and benefits after termination of plans), extends to matters far beyond collection of withdrawal liability. Like suits involving these other parties adversely affected in these other matters, even suits brought by plan sponsors seeking to claim withdrawal liability may perhaps independently rely upon the discovery prong of the time bar when "default" occurs for reasons other than the employer's failure to meet a sponsor's demand for payment. *See id.* § 1399(c)(5)(B) (plan rules to indicate events establishing default); *supra* n. 4. That is, in a host of claims arising out of the subtitle, section 1451(f)(2) retains independent significance even following our ruling today. Unsurprisingly in light of the statutory structure supporting our interpretation, *see supra* pp. 1122–1124, our conclusion about what triggers section 1451(f)(1)'s time bar in this narrow range of cases does not render section 1451(f)(2) mere surplusage.

Finally, Sandoz Masonry argues that only its interpretation of section 1451(f) accords with the purposes underlying ERISA and the MPPAA. *See* Brief for Appellee at 10, 13–17. Sandoz claims that any other reading would, as in this case, allow plans to wait for long, perhaps indefi-

nite, periods before claiming withdrawal liability from employers. This consequence, it asserts, flies in the face of Congressional intent that withdrawal liability be collected promptly, as well as against interests in repose and prevention of litigating stale claims that inhere in any statute of limitations.

Sandoz's reading of the purposes and policies animating the MPPAA is curiously one-dimensional. To be sure, Congress has indicated that promptly collecting outstanding sums is desirable. That indication, however, is one aspect of the Act's more general purpose of ensuring that plans collect the amounts due from employers, a purpose subsidiary to the Act's overriding purpose of ensuring that plans remain solvent despite employer withdrawals (and thus able to provide pension payments to workers who have earned them). *See, e.g., Connolly,* 475 U.S. at 214–17, 106 S.Ct. at 1020–22; *R.A. Gray & Co.,* 467 U.S. at 721–25, 104 S.Ct. at 2713–16; 29 U.S.C. §§ 1001, 1001a(c). The employer's reading of the statute would elevate one narrow statutory policy (favoring prompt collection) over the more general goal (collection) and overriding purpose (solvency) which animate and generate that narrow preference. There is no indication that the Act requires, as Sandoz would have it, either prompt collection or no collection at all. Rather, the Act requires that the plan sponsor act "as soon as practicable after an employer's complete ... withdrawal." 29 U.S.C. § 1399(b)(1).

In contrast, our interpretation of the statute both facilitates collection and recognizes the practical difficulties attending the determination of when complete withdrawal occurs. We decline to mandate the triggering of the limitations period at a moment (complete withdrawal) when for reasons both practical and epistemological, *see supra* pp. 1123–1124, the plan may not be expected immediately to assess and demand withdrawal liability. We favor, instead, the moment that most ensures that plans will be able to collect the sums that employers owe them. Our decision thus accords with the Act's more important goals of providing means for recovery and ensuring the financial viability of the funds; our conclusion also accords with the ultimate aim that workers receive pension payments which they have duly earned.

Similarly, the nature of a limitations period does not require the result that Sandoz favors. The employer's view would, certainly, produce more "bite," in the sense of barring more claims, than the view we adopt. But the Act's general policies, as we have seen, actually disfavor impediments to collection. Little in the Act favors the result pressed upon us by Sandoz. Congress could have precisely limited the period that might elapse between the employer's complete withdrawal and the plan sponsors' demand for payment, but the National Legislature instead required only that plan sponsors act "as soon as practicable after an employer's complete ... withdrawal." 29 U.S.C. § 1399(b)(1). Section 1451(f) does not more directly address or limit the particular period at issue, for that time bar applies to all causes arising under the subtitle. In the absence of some specific direction, we decline to fashion section 1451(f)'s bar to provide an additional incentive (with "bite," to be sure) for prompt plan sponsor action or to provide employers with greater repose, when the Act's general policies, operation, and language counsel otherwise.

In the end, Sandoz's argument in this respect discounts the significant incentives that will, in the usual case, induce plan sponsors to act promptly to calculate, schedule, and demand payment of withdrawal liability. The plan sponsor that unduly delays in taking appropriate action puts at risk the solvency of the plan and thus may invite a claim for breach of fiduciary duty. *Cf. Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (considering, in another ERISA context, scope of claims for breach of fiduciary duties); *McMahon v. McDowell,* 794 F.2d 100 (3d Cir.) (same), *cert. denied,* 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986). A delinquent sponsor may always be met in arbitration (as the plan sponsor in this case may well be met, *see infra* p. 1127) with the argument that

the plan has by virtue of delay run afoul of the Act's command that the plan sponsor demand payment of withdrawal liability "as soon as practicable after the employer's complete ... withdrawal." 29 U.S.C. § 1399(b). Finally, although the issue is far from settled, the plan through delay may forfeit its claim to interest accrued during the period from complete withdrawal to demand for payment. *Compare Milwaukee Brewery Workers' Pension Plan v. Schlitz Brewing Co.*, 9 Employee Benefits Cas. (BNA) 2385 (1988) (no preassessment interest allowed) *with Loomis Armored, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 8 Employee Benefits Cas. (BNA) 1899 (1987) (preassessment interest allowed). *See also* Brief for Amicus Curiae Pension Benefit Guaranty Corp. at 15 n. 11 (additional material cited). In short, even if the meaning of section 1451 were not so clearly contrary to that which Sandoz urges, these incentives would make us reluctant to shape the meaning of the time bar to achieve the goal of reducing the possibility of the plan sponsor's delay.

### III

Our cases firmly establish that the MPPAA emphatically favors arbitration as the means of resolving disputes "concerning a determination made under [29 U.S.C.] sections 1381 through 1399." 29 U.S.C. § 1401(a)(1); *see I.A.M. Nat'l Pension Fund, Plan A v. Clinton Engines Corp.*, 825 F.2d at 415; *Grand Union Co. v. Food Employers Labor Relations Ass'n*, 808 F.2d 66 (D.C.Cir.1987); *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204 (D.C.Cir.1984).[6]

To the extent practicable, therefore, any further proceedings should be conducted initially before an arbitrator. The full range of determinations made under sections 1381 through 1399 may, unless other impediments arise (which we obviously have no occasion to foresee, much less pass upon), be pressed before the arbitrator. For example, our ruling today does not address the issue whether the plan acted "as soon as practicable after the employer's complete ... withdrawal," 29 U.S.C. § 1399(b)(1), in notifying Sandoz Masonry of its withdrawal liability, or upon what the consequences of the plan's lack of compliance (if there indeed were non-compliance) with that provision would be. Commendably, counsel for the plan sponsors assured us at oral argument (as counsel had assured the court below, Tr. at 38) that Sandoz may, if it chooses, raise this and other issues before the arbitrator.

\* \* \* \* \* \*

For the foregoing reasons, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*Judgment accordingly.*

---

**6.** The limited issue of section 1451's general application falls within the exception to arbitration outlined in *Stockton*, as interpreted by *Grand Union*. *See Grand Union*, 808 F.2d at 70 (limiting *Stockton* exception to cases in which "neither party timely presses the plea in abatement, *and* the court finds that deferring a court contest while the parties repair to arbitration 'will neither lead to the application of superior expertise nor promote judicial economy,'" quoting *Stockton*, 727 F.2d at 1210). In this case, both parties agreed that the statute of limitations claim (alone) should be resolved in court. *See* Tr. at 3–5, 38. Additionally, the purely legal issue of the time bar involves no special expertise available to the arbitrator, and, given the posture of the proceedings, judicial economy is certainly served by our disposition of this single issue. The unusual circumstances of this dispute make this case one of the rare exceptions to the overwhelming statutory preference for arbitration. Indeed, this case furthers those general policies by reserving all other issues for subsequent dispute before an arbitrator.