# BAY AREA LAUNDRY AND DRY CLEANING PENSION TRUST FUND *v.* FERBAR CORPORATION OF CALIFORNIA, INC., ET AL.

No. 96–370.   Argued November 10, 1997—Decided December 15, 1997

GINSBURG, J., delivered the opinion for a unanimous Court.

*Marsha S. Berzon* argued the cause for petitioner. With her on the briefs was *Scott A. Kronland.*

*Edward C. Dumont* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Kneedler, Lisa Schiavo Blatt, James J. Keightley, Jeffrey B. Cohen, Israel Goldowitz,* and *Karen L. Morris.*

*William F. Terheyden* argued the cause for respondents. With him on the brief was *James P. Baker.**

---

*Briefs of *amici curiae* urging reversal were filed for the National Coordinating Committee for Multiemployer Plans et al. by *Gerald M. Feder, Diana L. S. Peters, Thomas C. Nyhan,* and *James P. Condon;* and for John T. Joyce et al., Trustees of the Bricklayers and Trowel Trades International Pension Fund, by *Ira R. Mitzner* and *Woody N. Peterson.*

JUSTICE GINSBURG delivered the opinion of the Court.

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 94 Stat. 1208, 29 U. S. C. §§ 1381–1461, requires employers who withdraw from underfunded multiemployer pension plans to pay a "withdrawal liability." An employer may discharge that obligation by making a series of periodic payments according to a postwithdrawal schedule set by the pension fund's trustees, or it may prepay the entire debt at any time. We resolve in this case a statute of limitations issue concerning this legislation, specifically: When does the MPPAA's six-year statute of limitations begin to run on a pension fund's action to collect unpaid withdrawal liability?

Dismissing petitioner trust fund's suit as time barred, the Court of Appeals for the Ninth Circuit held that the statute of limitations runs from the date the employer withdraws from the plan. We reject that ruling. A limitations period ordinarily does not begin to run until the plaintiff has a "complete and present cause of action." *Rawlings* v. *Ray*, 312 U. S. 96, 98 (1941). A cause of action does not ripen under the MPPAA until the employer fails to make a payment on the schedule set by the fund. Applying the ordinarily applicable accrual rule, we hold that the statute of limitations does not begin to run on withdrawal liability until a scheduled payment is missed.

Our holding prompts a second question, one that was not reached by the Court of Appeals. Petitioner brought this suit more than six years after respondents missed their first scheduled payment, but within six years of each subsequent missed payment. Respondents contend that petitioner's failure to sue within six years of the first missed payment bars suit for all missed payments. We disagree. The MPPAA imposes on employers an installment obligation. Consistent with general principles governing installment obligations, each missed payment creates a separate cause of action with its own six-year limitations period. Accord-

ingly, petitioner's suit is time barred only as to the first $345.50 payment.

## I

## A

Congress enacted the MPPAA to protect the financial solvency of multiemployer pension plans. See generally *Milwaukee Brewery Workers' Pension Plan* v. *Jos. Schlitz Brewing Co.*, 513 U. S. 414, 416–417 (1995); *Connolly* v. *Pension Benefit Guaranty Corporation*, 475 U. S. 211, 215–217 (1986); *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 722–724 (1984). The statute requires most employers who withdraw from underfunded multiemployer pension plans to pay "withdrawal liability." 29 U. S. C. § 1381(a). As relevant here, an employer incurs withdrawal liability when it effects a "complete withdrawal" from the plan. "[C]omplete withdrawal" occurs when the employer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." § 1383(a).[1]

Three Terms ago, we exhaustively described the MPPAA's complex scheme for calculating withdrawal liability. See *Milwaukee Brewery Workers' Pension Plan*, 513 U. S., at 417–419, 426. In brief, the Act sets the total amount of "withdrawal liability" at a level that roughly matches "the employer's proportionate share of the plan's 'unfunded vested benefits.'" *R. A. Gray & Co.*, 467 U. S., at 725 (quoting 29 U. S. C. § 1381(b)(1)); see § 1391. The employer must, at the least, make a series of periodic payments toward that total liability. §§ 1399(c)(1)(C), (c)(3). Payments are set at a level that approximates the periodic contributions the

---

[1] An "obligation to contribute" arises from either a collective-bargaining agreement or more general labor-law prescriptions. See 29 U. S. C. § 1392(a). The statute applies special definitions of "complete withdrawal" to particular industries. See, *e. g.*, §§ 1383(b), (c). The statute also imposes liability for "partial withdrawal" in some circumstances. §§ 1385, 1386.

employer had made before withdrawing from the plan. § 1399(c)(1)(C). Interest accrues from the first day of the plan year following withdrawal. See *Milwaukee Brewery Workers' Pension Plan*, 513 U. S., at 421. Payments can run for a period of up to 20 years, 29 U. S. C. § 1399(c)(1)(B), but the employer may prepay the outstanding principal, plus accrued interest, at any time. § 1399(c)(4).

The Act does not call upon the employer to propose the amount of withdrawal liability. Rather, it places the calculation burden on the plan's trustees. The trustees must set an installment schedule and demand payment "[a]s soon as practicable" after the employer's withdrawal. § 1399(b)(1). On receipt of the trustees' schedule and payment demand, the employer may invoke a dispute-resolution procedure that involves reconsideration by the trustees and, ultimately, arbitration. §§ 1399(b)(2), 1401(a)(1). If no party requests arbitration, the installments become "due and owing" on the trustees' schedule. § 1401(b)(1). Even if the employer challenges the trustees' withdrawal liability determination, however, it still must pay according to the trustees' schedule in the interim under the statute's "'pay now, dispute later' collection procedure." *Robbins* v. *Pepsi-Cola Metropolitan Bottling Co.*, 800 F. 2d 641, 642 (CA7 1986) *(per curiam)*.[2]

Should the employer fail to pay according to the schedule, the plan may, at its option, invoke a statutory acceleration provision. § 1399(c)(5). It may also sue to collect the unpaid debt. Plan fiduciaries "adversely affected by the act or omission of any party under" the MPPAA are entitled to "bring an action for appropriate legal or equitable relief, or

---

[2] See 29 U. S. C. § 1399(c)(2) ("Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor . . . no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule."); § 1401(d) (employer must make payments according to the plan's schedule "until the arbitrator issues a final decision with respect to the determination submitted for arbitration").

both." § 1451(a)(1). Suit under § 1451 must be filed within the longer of two limitations periods: "6 years after the date on which the cause of action arose," § 1451(f)(1), or "3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action," § 1451(f)(2). The Act extends the latter period to six years "in the case of fraud or concealment." *Ibid.*

## B

Petitioner Bay Area Laundry and Dry Cleaning Pension Trust Fund (Fund) is a multiemployer pension fund for laundry workers in the San Francisco Bay area. Respondents Ferbar Corporation and Stephen Barnes (collectively, Ferbar or the company) owned three laundries in the area until approximately 1990. For several years, Ferbar contributed to the Fund on behalf of employees at all three facilities. In 1983, Ferbar ceased contributions for one of the laundries; the company ceased contributions for the other two facilities in March 1985. Ferbar never resumed participation in the Fund.

On December 12, 1986, after concluding that Ferbar had completely withdrawn from the Fund, the trustees sent a letter to the company demanding payment of its withdrawal liability. The Fund calculated Ferbar's total liability as $45,570.80 and informed the company that it had two options: pay the entire liability as a lump sum within 60 days of receiving the letter, or pay $345.50 per month for 240 months, beginning February 1, 1987. Ferbar asked the trustees to review their decision pursuant to 29 U. S. C. § 1399(b)(2)(B), but received no response explicitly directed to that request. On July 8, 1987, Ferbar filed a notice of initiation of arbitration. Arbitration proceedings have not yet taken place.

Despite the statutory "pay now, dispute later" provisions, Ferbar has made no payments toward its withdrawal liability. On April 14, 1987, the Fund warned Ferbar that the company was delinquent and would be in default if it failed

to cure the delinquency within 60 days. On February 9, 1993, the Fund filed this action in the United States District Court for the Northern District of California. In its complaint, App. 6–12, the Fund sought to recover Ferbar's entire $45,570.80 withdrawal liability. In the alternative, it sought the $25,375.00 that had come due prior to the filing of the suit plus an injunction requiring Ferbar to make each future payment when due. The complaint was filed nearly eight years after Ferbar completely withdrew from the Fund in March 1985, six years and eight days after Ferbar missed its first scheduled payment on February 1, 1987, and less than six years after Ferbar missed the second and succeeding payments.

The District Court granted summary judgment to Ferbar on statute of limitations grounds. App. to Pet. for Cert. 6a–19a. It relied on two alternative rationales. First, the court concluded that 29 U. S. C. § 1451(f)(2)'s three-year "discovery" rule controlled. The Fund's action was therefore time barred, the District Court held, because it was filed well more than three years after the Fund had become aware of Ferbar's delinquency. Second, assuming that § 1451(f)(1)'s six-year "accrual" rule applied, the District Court believed the Fund's action nonetheless time barred. In the court's view, the six-year period began to run on Ferbar's entire $45,570.80 liability on February 1, 1987, the date the company missed its first $345.50 payment. On that view, the action was filed eight days too late.

The Ninth Circuit affirmed, but on different reasoning. 73 F. 3d 971 (1996). The Appeals Court rejected the District Court's conclusion that the Fund was required to sue within three years after learning of the cause of action. Adverting to the express terms of 29 U. S. C. § 1451(f), "which clearly direc[t] courts to apply 'the later of' the two periods of limitations," 73 F. 3d, at 972, the Ninth Circuit held that the Fund could commence suit up to six years after its cause of action arose. The court also rejected the District Court's

alternative conclusion that the Fund's cause of action accrued on the date of the first missed payment. Relying on its earlier decision in *Board of Trustees* v. *Thibodo*, 34 F. 3d 914 (1994), the Court of Appeals held that "the limitations period begins to run from the date of complete withdrawal—in this case, March 1985." 73 F. 3d, at 973. Under that reading, the action was filed nearly two years too late.

As Judge Trott indicated in his concurring opinion, *ibid.*, the Ninth Circuit's decision conflicts with an earlier decision of the District of Columbia Circuit, *Joyce* v. *Clyde Sandoz Masonry*, 871 F. 2d 1119 (1989). *Joyce* held that the statute of limitations on an action to collect unpaid withdrawal liability runs from the date the employer misses a scheduled payment, not from the date of complete withdrawal. *Id.*, at 1122–1127. The Third and Seventh Circuits have also held that the statute of limitations runs from the failure to make a payment, although they have disagreed as to whether each missed payment carries a separate limitations period or whether the first missed payment triggers the limitations period for the entire withdrawal liability. See *Board of Trustees of District 15 Machinists' Pension Fund* v. *Kahle Engineering Corp.*, 43 F. 3d 852, 857–861 (CA3 1994) (statute of limitations runs from each missed payment); *Central States, Southeast and Southwest Areas Pension Fund* v. *Navco*, 3 F. 3d 167, 172–173 (CA7 1993) (statute of limitations runs from first missed payment). We granted certiorari, 520 U. S. 1209 (1997), to resolve these conflicts.

## II

The Court of Appeals held that the statute of limitations on a pension plan's action to recover unpaid withdrawal liability runs from the date the employer withdraws from the plan. On that view, the limitations period commences at a time when the plan could not yet file suit. Such a result is inconsistent with basic limitations principles, and we reject it. A plan cannot maintain an action until the employer

misses a scheduled withdrawal liability payment. The statute of limitations does not begin to run until that time.

## A

By its terms, the MPPAA's six-year statute of limitations runs from "the date on which the cause of action arose." 29 U. S. C. § 1451(f)(1). This language, as we comprehend it, incorporates the standard rule that the limitations period commences when the plaintiff has "a complete and present cause of action." *Rawlings* v. *Ray*, 312 U. S., at 98; see also *Clark* v. *Iowa City*, 20 Wall. 583, 589 (1875) ("All statutes of limitation begin to run when the right of action is complete . . . ."). Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become "complete and present" for limitations purposes until the plaintiff can file suit and obtain relief. See *Reiter* v. *Cooper*, 507 U. S. 258, 267 (1993) ("While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, we will not infer such an odd result in the absence of any such indication in the statute."). The MPPAA contains no indication that Congress intended to depart from the general rule.

The date of withdrawal cannot start the statute of limitations clock, because the MPPAA affords a plan no basis to obtain relief against an employer on that date. The plan could not sue to undo the withdrawal, for an employer does not violate the MPPAA simply by exiting the plan. The Act takes as a given that employers may withdraw. Instead of prohibiting employers from leaving their plans, Congress imposed a scheme of mandatory payments designed to discourage withdrawals *ex ante* and cushion their impact *ex post*. See *Milwaukee Brewery Workers' Pension Plan*, 513 U. S., at 416–417; *Connolly*, 475 U. S., at 216–217. Under that scheme, withdrawal "merely sets in motion the usual (and

routine) process of calculation, notification, schedule, possible request for review or arbitration, and payment." *Joyce*, 871 F. 2d, at 1124.

Any pension plan suit to collect the employer's withdrawal liability, commenced on the date of withdrawal, would be premature. As we have previously explained, "the statute makes clear that the withdrawing employer owes nothing until its plan demands payment." *Milwaukee Brewery Workers' Pension Plan*, 513 U. S., at 423. Absent a demand, even a willing employer cannot satisfy its payment obligation, for "the withdrawing employer cannot determine, or pay, the amount of its debt until the plan has calculated that amount." *Ibid.* Once the demand is made, the employer's baseline obligation is to make each payment as scheduled, unless it chooses to prepay or the plan properly exercises the acceleration option. See 29 U. S. C. §§ 1399(c)(2), 1401(b)(1). Until the employer fails to honor its obligation, the plan cannot sue.

In sum, we hold that the MPPAA does not give a pension plan any claim for relief against an employer on the date of withdrawal. The plan's interest in receiving withdrawal liability does not ripen into a cause of action triggering the limitations period until two events transpire. First, the trustees must calculate the debt, set a schedule of installments, and demand payment pursuant to § 1399(b)(1). Second, the employer must default on an installment due and payable under the trustees' schedule. Only then has the employer violated an obligation owed the plan under the Act.

B

In reaching our conclusion, we have not overlooked arguments made by Ferbar or invoked by the Ninth Circuit. We set out those arguments here and our reasons for rejecting them.

Maintaining that a cause of action arises on the date of withdrawal, Ferbar relies on language in 29 U. S. C.

§ 1451(a)(1). That provision empowers a "plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan," to "bring an action for appropriate legal or equitable relief, or both." Ferbar asserts that a multiemployer plan is "adversely affected" whenever an employer withdraws. Accordingly, Ferbar urges, the plan's right of action is complete at the time of withdrawal.

Although the payment of withdrawal liability will offset the harmful impact of a participant's exit, we do not doubt that pension plans are adversely affected as a practical matter when an employer withdraws. But Ferbar's argument is off the mark. As the Fund points out, § 1451(a)(1) does not "provide a cause of action in the air for *any* adverse effect on multiemployer pension funds." Reply Brief for Petitioner 2.

Section 1451 prescribes a variety of procedures for the governance of civil actions brought to enforce the MPPAA. See, *e. g.*, 29 U. S. C. § 1451(c) (jurisdiction of federal and state courts), § 1451(d) (venue and service of process), § 1451(e) (costs and expenses). Subsection (a), headed "[p]ersons entitled to maintain actions," answers only a "standing" question—*who* may sue for a violation of the obligations established by the Act's substantive provisions. Subsection (a)(1) extends judicial remedies for violation of the MPPAA to a broad range of plaintiffs—any "plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected." But that provision does not make an "adverse effect" unlawful *per se*, any more than does § 10(a) of the Administrative Procedure Act, which similarly empowers "adversely affected" persons to invoke judicial remedies.[3] We see nothing in § 1451(a)(1) to justify the Court of Appeals'

---

[3] See 5 U. S. C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

holding that the statute of limitations begins to run on the date of withdrawal.

In adopting the date-of-withdrawal rule in *Thibodo* and applying it here, the Ninth Circuit did not rely on Ferbar's interpretation of § 1451(a)(1). Instead, the Court of Appeals rested its holding on two grounds, one based on statutory interpretation, the other on policy considerations. As to statutory interpretation, the court reasoned that a missed-payment approach would render § 1451(f)(2)'s three-year discovery rule superfluous, because a pension plan will inevitably learn of the missed payment just around the time it occurs; hence, § 1451(f)(1)'s six-year accrual rule would always provide "the later of" the two limitations periods. See *Thibodo*, 34 F. 3d, at 918.

We find this argument infirm. Section 1451(f)'s twin limitations periods govern much more than withdrawal liability; they apply to any "action under this section." 29 U. S. C. § 1451(f). Such actions can involve "matters far beyond collection of withdrawal liability," including "transfers of plan assets, reorganizations of plans, and benefits after termination of plans," all of which may involve matters not discovered until well after the cause of action accrues. *Joyce*, 871 F. 2d, at 1125. Even if the three-year discovery rule is superfluous in actions to collect unpaid withdrawal liability, it retains vitality in many other cases governed by § 1451.

The Court of Appeals' policy argument fares no better. The court reasoned that a rule pegging the statute to the schedule set by the plan's trustees would "improperly plac[e] the running of the limitations period in the control of the plaintiff." *Thibodo*, 34 F. 3d, at 917. But that is an unavoidable consequence of the scheme Congress adopted. Congress did not set a fixed time during which a pension fund's trustees must calculate the employer's withdrawal liability, although it surely could have done so. Notably, Congress adopted specific time limits to govern a number of

other steps in the assessment and collection process.[4]   Congress' adoption of a looser "as soon as practicable" requirement for the initial determination of withdrawal liability bespeaks a deliberate legislative choice to afford some flexibility in gathering the information and performing the complex calculations necessary to make that assessment.

Furthermore, we agree with the D. C. Circuit that "significant incentives . . . will, in the usual case, induce plan sponsors to act promptly to calculate, schedule, and demand payment of withdrawal liability." *Joyce*, 871 F. 2d, at 1126. Pension funds have a financial imperative to act quickly, for the contributions lost when the employer withdraws will not be replaced with withdrawal liability payments until the plan calculates those payments and serves a demand on the employer.   And as time passes, the likelihood that the plan will never receive payment increases.   If the trustees' delay in calculating withdrawal liability threatens a plan's financial position, that delay could constitute a breach of fiduciary duty actionable at the instance of the plan's beneficiaries. Also, if an employer believes the trustees have failed to comply with their "as soon as practicable" responsibility, the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment. See *ibid.*   The Ninth Circuit's policy concerns, in short, do not warrant an extraordinary reading of § 1451(f) that would trigger the statute of limitations before a cause of action accrues.

---

[4] See 29 U. S. C. § 1399(a) (employer must furnish requested information to the plan sponsor within 30 days); § 1399(b)(2)(A) (employer may seek reconsideration of withdrawal liability assessment within 90 days); § 1399(c)(2) (withdrawal liability shall be payable according to the plan sponsor's schedule, beginning no later than 60 days after the date of the demand); § 1401(a)(1) (either party may request arbitration within the earlier of 60 days after the plan responds to the employer's request for reconsideration or 180 days after the employer sought reconsideration).

## III

Although we have rejected the Court of Appeals' conclusion that the limitations period commenced on the date of withdrawal, that holding alone does not resolve the limitations issue in this case. The Fund filed its complaint on February 9, 1993. That date was more than six years after Ferbar missed its first payment (which the Fund had set for February 1, 1987), but within six years of the dates scheduled for the second and succeeding payments. Because suit was instituted more than six years after the due date of the first payment, the District Court alternatively held that the action was time barred in its entirety. See *supra*, at 199.

The District Court's alternative ruling implicates a conflict in the Circuits. The Seventh Circuit has held, in line with the District Court's view here, that the statute of limitations on the entire withdrawal liability begins to run when the employer misses its first scheduled installment. Under the rule advanced by the Seventh Circuit, a plan that sues too late to recover the first payment forfeits the right to recover any of the outstanding withdrawal liability. *Navco*, 3 F. 3d, at 172–173. By contrast, the Third Circuit has held that each missed payment creates a separate cause of action with its own six-year limitations period. Under the rule advanced by the Third Circuit, a plaintiff who does not sue in time to recover the first payment may still recover any succeeding payments that came due within six years of the complaint. *Kahle Engineering Corp.*, 43 F. 3d, at 857–861. We conclude that the Third Circuit's approach is the correct one. The Fund's action is therefore barred only insofar as it seeks to recover Ferbar's first $345.50 installment.

## A

In briefing on the merits—but not in its petition for certiorari—the Fund argued that we need not resolve the question that has divided the Third and Seventh Circuits. We can

avoid that issue, the Fund submits, because its action was timely even as to the first payment. The Fund relies on 29 U. S. C. § 1399(c)(2), which provides: "Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor . . . beginning no later than 60 days after the date of the demand . . . ." The Fund reads this provision as extending Ferbar's time to make its first payment until February 10, 1987—60 days after the Fund sent the company a letter demanding the withdrawal liability. Brief for Petitioner 35; see Reply Brief for Petitioner 16. At oral argument, the Fund further suggested that the terms of the December 12, 1986, demand letter, which purported to allow Ferbar 60 days from the letter's receipt to prepay the entire liability, independently warrant the same result. Tr. of Oral Arg. 12, 53. The Fund made both of these arguments in the Court of Appeals. See Brief for Appellant in No. 94–15976 (CA9), p. 11.

We are satisfied, however, that the Fund has waived any right to seek the first payment here. In its petition for certiorari, the Fund did not argue that its action was timely as to that installment. To the contrary, it stated: "On the facts of this case, the difference between the Third and Seventh Circuit positions is determinative," for "[u]nder the Seventh Circuit's *Navco* interpretation of the statute, the suit is barred (as the District Court in this case alternatively held)." Pet. for Cert. 15–16. These representations would be inaccurate if, as the Fund now argues, the action to recover the first installment was in any event timely. Having urged that we grant certiorari to resolve not only the statute of limitations triggering date, but also the ultimately "determinative" question that divided the Third and Seventh Circuits, the Fund is not positioned to revive its claim for the first $345.50 payment. Cf. *Taylor* v. *Freeland & Kronz*, 503 U. S. 638, 645 (1992) (declining to consider argument with-

held from the petition for certiorari and made for the first time in briefing on the merits).

## B

A withdrawing employer's basic responsibility under the MPPAA is to make each withdrawal liability payment when due. The Act thus establishes an installment obligation. Just as a pension plan cannot sue to recover *any* withdrawal liability until the employer misses a scheduled payment, so too must the plan generally wait until the employer misses a particular payment before suing to collect *that payment.* As we have explained, a statute of limitations ordinarily does not begin to run until the plaintiff could sue to enforce the obligation at issue. We therefore agree with the Third Circuit that "a new cause of action," carrying its own limitations period, "arises from the date each payment is missed." *Kahle Engineering Corp.,* 43 F. 3d, at 857. That is the standard rule for installment obligations, and nothing in the MPPAA indicates that Congress intended to depart from it.

The general rule applies even though a plan has the option to accelerate and collect the entire debt if the employer defaults. See 29 U. S. C. § 1399(c)(5). For limitations purposes, we cannot assume that a default will or should invariably lead to acceleration, for the statutory acceleration provision is by its terms permissive. See *ibid.* ("In the event of a default, a plan sponsor *may* require immediate payment . . . .") (emphasis added). Trustees confronting a delinquent employer may accelerate if they decide such a course is in the best interests of the plan, but they need not do so to preserve the plan's right to recover future payments. Cf. *Kahle Engineering Corp.,* 43 F. 3d, at 859, and n. 7 (describing reasons why acceleration might not be in the plan's best interests). This, again, is the rule that generally applies to installment obligations. If the creditor refrains from exercising the acceleration option, the limitations pe-

riod on a particular payment runs from the date that payment comes due.[5]

Rejecting the approach we now endorse, the Seventh Circuit regarded the foregoing principles as controlling contractual obligations only. Where "the employer did not assent to a longer period for payment and suit," that court concluded, a pension fund has "only one claim against the employer"—"the amount of withdrawal liability. Although a fund may permit an employer to amortize this sum over 20 years . . . the whole amount is presumptively due at the outset." *Navco*, 3 F. 3d, at 172 (emphasis deleted). The Ninth Circuit appeared to entertain a similar view in this case. See 73 F. 3d, at 973, n. 4 ("Ferbar never agreed to the installment plan proposed by the Fund and made no installment payments. As a result, it appears that no new contract to pay off the withdrawal liability could have been formed.").

We cannot agree that the rule that each missed payment carries its own limitations period turns on the origin—contractual or otherwise—of an installment obligation. Courts have repeatedly applied the rule in actions to collect on installment judgments, even though such obligations obviously

---

[5] See *Board of Trustees of Dist. 15 Machinists' Pension Fund* v. *Kahle Engineering Corp.*, 43 F. 3d 852, 857 (CA3 1994) ("'[W]here there is an acceleration clause giving the creditor the right upon certain contingencies to declare the whole sum due, the statute begins to run, only with respect to each instalment, at the time the instalment becomes due, unless the creditor exercises his option to declare the whole indebtedness due, in which case the statute begins to run from the date of the exercise of his option.'") (quoting 51 Am. Jur. 2d, Limitation of Actions § 133 (1970)); see also 4 A. Corbin, Contracts § 951 (1951) ("[T]he creditor is not required to join subsequent instalments in his action for the first instalment, if the acceleration clause is regarded as giving him an option. In such case, the statute does not begin to run against later instalments until each falls due in regular course."). The statute of limitations on an accelerated debt runs from the date the creditor exercises its acceleration option, not earlier. Therefore, we need not consider Ferbar's contention that the Fund's complaint, which sought to recover the entire withdrawal liability, amounted to a decision to accelerate. See Brief for Respondents 39.

are not contractual.[6] Nor can we agree that an installment obligation arises only on the employer's assent. The MPPAA itself creates such an obligation. Unless the employer prepays, the Act requires it, like any other installment debtor, to make payments when due. Like the typical installment creditor, the plan has no right, absent default and acceleration, to sue to collect payments before they are due, and it has no obligation to accelerate on default. The employer and the plan are thus in the same position as parties to an ordinary installment transaction. We see no reason to apply a different limitations rule.

Our holding does not, as the Seventh Circuit believed, "[t]ur[n] six years into twenty-six." *Navco*, 3 F. 3d, at 172. A pension fund's action to collect unpaid withdrawal liability is timely as to any payments that came due during the six years preceding the suit. Payments that came due prior to that time are lost. Applying that rule here, the Fund may not recover Ferbar's first $345.50 payment. But its action to recover the subsequent installments may proceed.

\* \* \*

For the reasons stated, the judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[6] See *Kuhn* v. *Kuhn*, 273 Ind. 67, 71–72, 402 N. E. 2d 989, 991 (1980) (court-ordered installments on a child support judgment); *Dent* v. *Casaga*, 296 Minn. 292, 297, 208 N. W. 2d 734, 737 (1973) (same); *Roberts* v. *Roberts*, 69 Wash. 2d 863, 866–867, 420 P. 2d 864, 866 (1966) (child support and alimony); cf. *Miller* v. *Miller*, 122 F. 2d 209, 211 (CADC 1941) (suit to collect unpaid alimony timely because filed within limitations period of first missed installment).