RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

MARGARET WIKE,

          *Plaintiff-Appellant,*

      *v.*

VERTRUE, INC., ADAPTIVE MARKETING, LLC,
and INFLUENT, INC.,

          *Defendants-Appellees.*

No. 08-5905

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00204—Robert L. Echols, District Judge.

Argued and Submitted: April 23, 2009

Decided and Filed: June 2, 2009

Before: SUHRHEINRICH, BATCHELDER and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Daniel C. Girard, GIRARD GIBBS, San Francisco, California, for Appellant. Robert Allen Horowitz, GREENBERG TRAURIG, New York, New York, for Appellees. **ON BRIEF:** Daniel C. Girard, GIRARD GIBBS, San Francisco, California, Gerald E. Martin, BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, for Appellant. Robert Allen Horowitz, Toby Sue Soli, GREENBERG TRAURIG, New York, New York, and Robert S. Patterson, BRADLEY, ARANT, BOULT & CUMMINGS, Nashville, Tennessee, for Appellees Vertrue, Inc. and Adaptive Marketing, LLC. Jay A. Yurkiw, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellee Influent, Inc.

_____

## OPINION

_____

SUTTON, Circuit Judge. Margaret Wike filed this lawsuit against Vertrue and its subsidiary, Adaptive Marketing (collectively, "Vertrue"), claiming that Vertrue violated federal law by enrolling her in a discount club and charging a monthly fee to her debit card.

The district court granted summary judgment to Vertrue on Wike's claim under the Electronic Funds Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.*, and it denied her leave to amend her complaint to add claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Concluding that EFTA's one-year statute of limitations does not bar Wike's claim, we reverse.

I.

On February 13, 2005, Wike called America Online (AOL) to set up an internet-service account for a friend. At the end of the call, the AOL representative told Wike that she was eligible to claim a free $50 Wal-Mart gift card and, with Wike's permission, transferred Wike's call to another operator who would provide more details. That operator turned out to be a telemarketer for Influent, which sold memberships in discount clubs and other programs for Vertrue.

Once connected with Wike, the telemarketer confirmed Wike's name, address and telephone number and told her that, as a Galleria member, she would receive a "membership kit" explaining how to claim her Wal-Mart gift card. ROA 1585. Yet Galleria membership, the telemarketer explained, was not free: Wike would be billed $1 that day and, after a 30-day trial period, would be billed $19.95 each month thereafter, unless and until Wike cancelled her membership. Wike agreed, provided her Visa debit-card number and declined an offer for a second discount club the telemarketer pitched.

Wike claims she never received the promised membership kit (which Vertrue insists it sent), though she acknowledges she might have disregarded it as junk mail. Nor did Wike question the first $19.95 charge for "galleriausa" on her March 2005 bank-account statement, mistakenly believing that it pertained to an unrelated purchase. ROA 1505.

When a second monthly charge showed up on April 21, it got Wike's attention. She called Galleria's support number several times over the ensuing months, asking that her membership be canceled and the monthly charges refunded. None of this worked—she received no refunds, and the monthly charges continued—until October 2005, when Wike canceled her account and received a partial refund.

Wike filed this class-action lawsuit against Vertrue in March 2006, alleging (in addition to other claims not at issue in this appeal) that Vertrue's marketing practices violated EFTA, 15 U.S.C. § 1693 *et seq.* The district court granted summary judgment for Vertrue, concluding that EFTA's one-year limitations period barred Wike's claim.

Wike sought leave to add RICO claims to her complaint, alleging that Vertrue had ensnared Wike and "hundreds of thousands" of other consumers in a deceptive marketing scheme. ROA 1000. The district court denied Wike's request, concluding that the proposed amendment would be futile because Wike could not show she was injured "by reason of" Vertrue's alleged racketeering activity, 18 U.S.C. § 1964(c). Wike appeals both rulings.

## II.

Wike first challenges the statute-of-limitations ruling. Enacted in 1978 as an amendment to the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*, EFTA creates a "framework [of] rights, liabilities, and responsibilities of participants in electronic fund transfer systems," *id.* § 1693(a). The statute covers a wide range of electronic money transfers—from ATM withdrawals and debit-card payments to banking by phone—and subjects them to a litany of procedural requirements designed to protect consumers from transactions made in error or without their consent. *See id.* §§ 1693a(6), 1693b–1693f. In addition to limiting a consumer's liability for erroneous and unauthorized transfers, the statute authorizes aggrieved consumers to file money-damages actions, which when successful come with attorney's fees. *Id.* § 1693m(a).

Wike claims that Vertrue violated the statute's restriction on "preauthorized electronic fund transfer[s]," *id.* § 1693a(9), which may be permitted by consumers "only in writing," a copy of which must be given "to the consumer when made," *id.* § 1693e(a); *accord* 12 C.F.R. § 205.10(b); *see also id.* pt. 205 supp. I, ¶ 10(b)(2). Vertrue did not comply with these requirements, Wike says, when the telemarketer enrolled her in the Galleria program: It set up recurring charges to her Visa debit card without obtaining her assent in writing (having obtained consent over the phone) and without giving her a copy of the writing (there being no writing to give).

The question in this appeal, however, is not whether Wike filed a valid EFTA claim; it is whether she filed a timely one. Consumers must file claims "within one year from the date of the occurrence of the violation," 15 U.S.C. § 1693m(g), and the question here is when the alleged violation occurred. The district court concluded that a violation of the preauthorized-transfer rule occurs when the payee—here, Vertrue—takes all of the steps necessary to arrange a future transfer, even if no transfer has yet taken place, while Wike argues that a violation occurs when the first transfer takes place. Everyone agrees that the transfers from Wike's bank account were arranged on February 14, 2005, that the first recurring transfer occurred on March 22, 2005, and that Wike filed her complaint on March 14, 2006. Her complaint thus is timely if the date of the transfer, not the date Vertrue arranged for the transfer, triggers the limitations clock.

As we see it, the one-year limitations period began when the first recurring transfer took place, not when Vertrue arranged it. Several clues point to the moment of transfer as the pivotal event. *First*, the key provision speaks of preauthorized "transfers," not efforts to arrange them. *Id.* § 1693e(a). The same section also gives consumers who discover preplanned transfers before they happen a mechanism for stopping them. *Id.* And beyond the special safeguards that apply only to preauthorized transfers, EFTA imposes several protections geared to ensuring that consumers learn about transfers from their bank accounts, understand their liability for such transfers and have ample opportunities to dispute (and seek reimbursement for) transactions they did not authorize. *See id.* §§ 1693b–1693h.

Until the transfer takes place, indeed, nothing guarantees that it will happen or that the consumer will suffer any harm. An entity like Vertrue could make a mistake while initiating a transfer with a consumer's bank, or the bank might fail to execute the transfer—either because it dropped the ball or, if it recognizes the transfer is unauthorized, because it sought to protect a customer. If the consumer learns of the transfer in time, he too can break the chain by ordering his bank to stop payment. *Id.* § 1693e(a). We seriously doubt that Vertrue (or any other payee in its situation) would concede an EFTA violation if any of these contingencies interrupted the process and prevented the transfer from occurring. Because there is no assurance at the time a payee attempts to initiate a transfer that anything will come of it, there is good reason to think Congress created a cause of action that accrues

only when the reality of harm, not its mere possibility, takes place—which is when "transfers" occur. *Id.*

*Second*, as a "standard rule," the statute of limitations begins to run "when the plaintiff has a complete and present cause of action" and thus "can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 201 (1997) (internal quotation marks omitted). Customarily, that is true when the defendant breaches a duty (here a duty imposed by statute) and the claimant is injured. Here, Vertrue violated a duty when it initiated the transfers, but Wike was not injured until the first transfer occurred. A consumer is injured only if, and only when, funds are withdrawn from her account. *Cf. Wachtel v. West*, 476 F.2d 1062, 1065–66 (6th Cir. 1973) (holding that a violation of the Truth in Lending Act's disclosure requirements occurs, and the limitations clock starts, when a lender enters a credit contract with a borrower without making required disclosures, because the harm the borrower suffers—an inability to compare meaningfully other lenders' offers—materializes when the borrower becomes locked into a loan agreement). No doubt, Congress may have authority in some settings to alter this "standard rule" and to create a limitations period that begins before a plaintiff has a cause of action, injury included. *Bay Area Laundry*, 522 U.S. at 201. But we hesitate to infer such an unusual outcome absent some clear indication in the statute, *see id.*, and EFTA contains no such indication.

*Third*, the practicalities of these transactions support this interpretation. How can a consumer learn of a noncompliant transfer—and know that the time for protecting her rights is running—until the transfer takes place? Say a telemarketer sets up a string of recurring future transfers from a consumer to itself and does so without obtaining the consumer's consent. It is only when the first transfer occurs that the consumer will find out what happened, and it thus is only then that the consumer will have any reason to vindicate her EFTA rights. Some consumers, it is true, may know about an arranged transfer, even an improper one, before it occurs. But the statute offers no handhold for creating two accrual dates, one for consumers who know that an improper transfer has been arranged and another for those who do not.

In this setting, moreover, severing the statute-of-limitations trigger from the consumer's cause of action would lead to a peculiar result. If the limitations clock starts when a payee arranges a future transfer, but the plaintiff cannot sue until a transfer occurs, then the payee could violate EFTA with impunity. As long as the payee sets up transfers that will occur at least a year in the future, the plaintiff's time to file suit would run out before he has a claim to bring.

The district court, confronting a difficult question that no federal court of appeals has yet faced, decided otherwise because the statute imposed obligations on Vertrue before the first recurring transfer took place. At some point before withdrawing funds from Wike's account, Vertrue had to obtain her written consent and give her a record of that writing. 15 U.S.C. § 1693e(a). But nothing in § 1693e(a) pinpoints *when* Vertrue had to fulfill those obligations. We know that if and when the payee secures the consumer's consent in writing, it must furnish a copy of that writing to the consumer. *Id.* § 1693e(a). And "preauthorized" transfers by definition must be authorized "in advance." *Id.* § 1693a(9). But nothing in the statute says how far in advance the payee must obtain the consumer's authorization or whether it must do so at the time it arranges the transfer. Because EFTA leaves us in the dark about when a payee's *inaction* evolves into a violation (save upon a transfer), it makes little sense to say that a consumer's cause of action arises at the moment—what moment?—the payee fails to comply with § 1693e(a)'s authorization requirement. Better in our view to pin the accrual on an identifiable date when the plaintiff has been injured *and* an EFTA duty necessarily has been violated—the date of the first transfer.

The district court thought that a different provision cured this problem. Section 1693a(11) defines an "unauthorized electronic funds transfer" as (among other things) a "transfer from a consumer's account *initiated* by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." *Id.* § 1693a(11) (emphasis added). Zeroing in on the word "initiated," the court concluded that in the eyes of EFTA, the critical moment in Wike's interaction with Vertrue's agents was when Vertrue took all of the necessary steps to make the transfers happen.

Yet that reading runs aground in two places. One is that the statute's definition of "unauthorized" transfers has nothing to do with whether, or when, Vertrue violated the

requirements governing "preauthorized" transfers. The two provisions are related in the sense that a preplanned, recurring transfer made without meeting § 1693e(a)'s prerequisites may also become an "unauthorized" transfer once the claimant satisfies § 1693a(11)'s other elements. But the provisions impose different requirements with different consequences. A transfer is "unauthorized" only if the consumer received no benefit for it. *Id.* § 1693a(11). And as Vertrue acknowledges, a payee that arranges a covered preauthorized transfer may face liability under § 1693e(a) whether or not the transfer is "unauthorized." Whether the transfer is also "unauthorized" under § 1693a(11), in fact, matters only to whether the consumer, his financial institution or both will bear ultimate responsibility for a particular transfer the consumer later contests. *See id.* §§ 1693f–1693g. Whether the monthly withdrawals from Wike's account were "unauthorized" thus may determine whether she can force her bank to reimburse her, but it has nothing to do with whether Vertrue violated § 1693e(a). Section 1693a(11) sheds no light on this case, for by its terms and design it illuminates a different issue.

The other problem is that the language of § 1693a(11) does not show that the moment a payee prearranges a transfer is the moment that matters. Read in context, the key phrase—"initiated by a person other than the consumer without actual authority to initiate such transfer"—speaks not to the *time* a transfer is arranged, or even to the way it is arranged, but to *who* makes it happen. *Id.* § 1693a(11). It tells us simply that an "unauthorized" transfer means one made by a person lacking authority to do so.

Vertrue fares no better in arguing that EFTA's time bar is a statute of repose, not a statute of limitations. Vertrue may be correct that, although we often employ these terms as synonyms, *see, e.g.*, *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 503 (6th Cir. 1998), we sometimes distinguish the former—which runs from the date of the defendant's conduct, not the plaintiff's injury—from the latter, *see, e.g.*, *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 590 n.11 (6th Cir. 2004); *Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 901–03 (6th Cir. 2002).

But that conceptual distinction adds nothing to this case. It is not clear, as an initial matter, whether EFTA's time-bar provision even fits into the statute-of-repose category. True, it speaks of the "date of the occurrence of the violation," 15 U.S.C. § 1693m(g), not

the date of the plaintiff's injury. *Cf. Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 506, 508–09 (5th Cir. 2008) (construing similar language in § 1691e(f) as a statute of repose not subject to a discovery rule). But so does the identical limitations language in the Truth in Lending Act, 15 U.S.C. § 1640(e), which we have described before as a statute of limitations, *see, e.g.*, *Weston v. AmeriBank*, 265 F.3d 366, 368 (6th Cir. 2001); *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1040–41 (6th Cir. 1984).

Yet all of this makes no difference because, even if we grant that the EFTA provision is a statute of repose—triggered by conduct, not consequences—that still requires us to determine what conduct counts, what conduct in other words adds up to a violation. EFTA, as we have shown, says nothing about when, before a transfer, a payee must obtain the consumer's written authorization. Characterizing § 1693m(g) as a statute of repose does not change the fact that only a noncompliant transfer, not a payee's freestanding failure to obtain authorization for an as-yet-unconsummated transaction, starts the limitations clock.

At oral argument, counsel for Vertrue suggested that comparing EFTA's time-limiting language with parallel provisions in the federal securities laws proves that Wike's claim accrued when Vertrue initiated the transfer. It does not. Fraud claims under the 1934 Securities Exchange Act are subject to a two-tiered limitations period: Plaintiffs must bring suit either within "2 years after the discovery of the facts constituting the violation"—or when the plaintiff should have discovered those facts through reasonable diligence—or else within "5 years after such violation," whichever comes first. 28 U.S.C. § 1658(b); *see In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 160–61 (3d Cir. 2008); *cf.* 15 U.S.C. § 77m (imposing a similar two-layered limitations period for claims under the 1933 Securities Act). Because Congress created a separate, shorter limitations period that starts to run once the plaintiff has reason to know that he has a claim, it makes sense to treat the "violation" that triggers the five-year time bar as encompassing only the defendant's fraudulent conduct. But that tells us nothing about the meaning of EFTA's time-limiting language, which erects a single one-year bar and which contains no carve-out for cases in which the plaintiff is on notice of a violation. Nothing in *this* statutory scheme offers a comparable basis for initiating the limitations clock before any harm has materialized and before the consumer has reason to know the payee has done anything wrong.

Vertrue's counsel also alluded to the availability of statutory damages as proof that even a plaintiff who has suffered no actual harm may bring a lawsuit alleging a payee has failed to fulfill EFTA's requirements. *See* 15 U.S.C. § 1693m(a)(2)(A). But even assuming (without deciding) that the statute permits a plaintiff who has suffered no injury to seek statutory damages, that does not demonstrate that a consumer's claim accrues when a transfer is initiated. The availability of such relief (plus attorney's fees) may encourage claimants to file suit and may ensure that violations do not go undeterred. But it does not explain why Congress would require such a plaintiff to sue without knowing that a violation has occurred and why Congress would link the limitations period to a payee's breach of a duty without specifying when that duty must be performed.

In resolving this issue, we need not decide a related question: Must a consumer know that a noncompliant transfer has occurred before the limitations clock starts? Although EFTA's other provisions reduce the risk that a consumer will remain ignorant of such transfers, *see, e.g.*, *id*. §§ 1693d(c)(1), 1693f(f)(3), it does not say whether a consumer who receives delayed notice of a noncompliant transfer can sue once the one-year window has closed. Whether EFTA incorporates a discovery rule or permits equitable tolling are matters for another day. For today's purposes, it suffices to say that, because the bank made the first recurring transfer from Wike's account less than a year before this lawsuit, she timely filed her EFTA claim.

III.

Wike also claims that the district court erred in denying her leave to amend her complaint to add RICO claims against Vertrue. Since the district court issued its decision, our court has decided one case, *Brown v. Cassens Transp. Co.*, 546 F.3d 347 (6th Cir. 2008), that bears on this question. And just before the district court's decision, the Supreme Court announced another decision, *Bridge v. Phoenix Bond & Indem. Co.*, __ U.S. __, 128 S. Ct. 2131 (2008), that bears on this question. Because we have decided that Wike has a non-time-barred EFTA claim, because we must return this case to the district court in any event and because most leave-to-amend decisions are largely discretionary, it makes sense to allow the district court to decide at this point whether to allow Wike to add a RICO claim.

IV.

For these reasons, we reverse and remand for further proceedings.