COLLOTON, Circuit Judge, dissenting.
 

 Russell Bucklew alleges that the State of Missouri's method of execution by lethal injection violates his rights under the Eighth and Fourteenth Amendments. He seeks an injunction prohibiting an execution by that method. The district court granted summary judgment for the State, but there are genuine disputes of material fact that require findings of fact by the district court before this dispute can be resolved. I would therefore remand the case for the district court promptly to conduct further proceedings.
 

 Bucklew's claim under
 
 42 U.S.C. § 1983
 
 requires him to prove two elements: (1) that the State's method of execution is sure or very likely to cause him severe pain, and (2) that an alternative method of execution that is feasible and readily implemented would significantly reduce the substantial risk of severe pain.
 
 Glossip v. Gross
 
 , --- U.S. ----,
 
 135 S.Ct. 2726
 
 , 2737,
 
 192 L.Ed.2d 761
 
 (2015) ;
 
 Bucklew v. Lombardi
 
 ,
 
 783 F.3d 1120
 
 , 1123, 1128 (8th Cir. 2015) (en banc). On the first element, the district court concluded that taking the evidence in the light most favorable to Bucklew, there is a substantial risk under Missouri's lethal injection protocol that Bucklew will experience choking and an inability to breathe for up to four minutes. On the second element, however, the court ruled as a matter of law that Bucklew's suggested alternative method-execution by administration of nitrogen gas-would not significantly reduce the substantial risk that the court identified under the first element. In my view, the district court's reasoning as to the first element is inconsistent with its summary disposition of Bucklew's claim on the second.
 

 On the first element, Bucklew's theory is that he will suffer severe pain by prolonged choking or suffocation if the State executes him by lethal injection. He contends that when he lies supine on the execution gurney, tumors in his throat will block his airway unless he can "adjust" his positioning to enable breathing. Bucklew argues that if an injection of pentobarbital renders him unable to adjust his positioning while he can still sense pain, then he will choke or suffocate.
 

 In assessing that claim, the district court cited conflicting expert testimony from Bucklew's expert, Dr. Joel Zivot, and the State's expert, Dr. Joseph Antognini. Dr. Antognini testified that if the State proceeded by way of lethal injection using
 pentobarbital, then Bucklew would be unconscious within twenty to thirty seconds and incapable of experiencing pain at that point. R. Doc. 182-5, at 10, 40-41. Dr. Zivot, however, differed: "I strongly disagree with Dr. Antognini's repeated claim that the pentobarbital injection would result in 'rapid unconsciousness' and therefore Mr. Bucklew would not experience any suffocating or choking." R. Doc. 182-1, at 147. Zivot opined that Bucklew "would likely experience unconsciousness that sets in progressively as the chemical circulates through his system," and that "during this in-between twilight stage," Bucklew "is likely to experience prolonged feelings of suffocation and excruciating pain."
 

 Id.
 

 In his deposition, Dr. Zivot opined that "there will be points," before Bucklew dies, "where he's beginning to experience the effects of the pentobarbital, where his ability to control and regulate and adjust his airway will be impaired, although there will still be the experience capable of knowing that he cannot make the adjustment, and will experience it as choking."
 
 Id.
 
 at 81. When directed to Dr. Antognini's opinion that Bucklew would be unaware of noxious stimuli within twenty to thirty seconds of a pentobarbital injection, Dr. Zivot observed that Antognini's opinion was based on a study involving dogs from fifty years ago and testified that his "number would be longer than that."
 
 Id.
 
 at 85. When asked for his "number," Dr. Zivot pointed to a study on lethal injections administered to horses; he said the study recorded "a range of as short as fifty-two seconds and as long as about two hundred and forty seconds before they see isoelectric EEG."
 
 Id.
 
 at 85-86. Dr. Zivot noted that the "number" that he derived from the horse study was "more than twice as long as" the number suggested by Dr. Antognini.
 
 Id.
 
 at 86. He defined "isoelectric EEG" as "indicative of at least electrical silence on the parts of the brain that the electroencephalogram has access to."
 
 Id.
 

 The district court observed that "[a]n execution is typically conducted with the prisoner lying on his back," and that the record "establishes that [Bucklew] has difficulty breathing while in that position because the tumors can cause choking or an inability to breathe." The court understood Dr. Zivot to mean that "it could be fifty-two to 240 seconds before the pentobarbital induces a state in which [Bucklew] could no longer sense that he is choking or unable to breathe." Thus, the court concluded that "construing the Record in [Bucklew's] favor reveals that it could be fifty-two to 240 seconds before the pentobarbital induces a state in which [Bucklew] could no longer sense that he is choking or unable to breathe." Again, the court reasoned that "the facts construed in [Bucklew's] favor would permit a factfinder to conclude that for as long as four minutes [Bucklew] could be aware that he is choking or unable to breathe but be unable to 'adjust' his breathing to remedy the situation." On that basis, the court presumed for purposes of the motion for summary judgment that "there is a substantial risk that [Bucklew] will experience choking and an inability to breathe for up to four minutes."
 

 The State disputes that there is a genuine dispute of material fact on the first element of Bucklew's claim, but the district court properly concluded that findings of fact were required. Bucklew pointed to evidence from Missouri corrections officials that prisoners have always laid flat on their backs during executions by lethal injection in Missouri. R. Doc. 182-7, at 10; R. Doc. 182-9, at 1; R. Doc. 182-12, at 29, 91. One official testified that he did not know whether the gurney could be adjusted. R. Doc. 182-12, at 91. Another official believed that the head of the gurney
 "could" be raised (or that a gurney with that capability could be acquired), and that an anesthesiologist would have "the freedom" to adjust the gurney "if" he or she determined that it would be in the best medical interest of the offender to do so. R. Doc. 182-7, at 14. But the State did not present evidence about how it would position Bucklew or the gurney during his execution. On a motion for summary judgment, the district court was required to construe the evidence in the light most favorable to Bucklew. Under that standard, without undisputed evidence from the State that it would alter its ordinary procedures, the court did not err by concluding that a finder of fact could infer that the State would proceed as in all other executions, with Bucklew lying on his back.
 
 [5]
 

 The State argues that the district court erred in discerning a genuine dispute of material fact on the first element because Dr. Zivot did not specify the length of the expected "twilight stage" during which Bucklew would be unable to adjust his positioning yet still sense pain. The State also complains that Dr. Zivot did not specify that Bucklew's pain awareness would continue for fifty-two seconds or longer until brain waves ceased. There certainly are grounds to attack the reliability and credibility of Dr. Zivot's opinion, including the imprecision of some of his testimony, his opposition to all forms of lethal injection, his possible misreading of the horse study on which he partially relied, and his inaccurate predictions of calamities at prior executions. But he did opine that Bucklew was likely to "experience prolonged feelings of suffocation and excruciating pain" if executed by lethal injection, R. Doc. 182-1, at 147, and that there "will be points" before Bucklew dies when his ability to regulate his airway will be impaired so that he "will experience it as choking."
 
 Id.
 
 at 81. The district court did not err in concluding that it could not resolve the dispute between the experts on summary judgment.
 

 On the second element of Bucklew's claim, the district court concluded as a matter of law that Bucklew failed to show that his proposed alternative method of execution-administration of nitrogen gas-would significantly reduce the substantial risk of severe pain that the court recognized under the first element. The majority affirms the district court's judgment on this basis. Taking the evidence in the light most favorable to Bucklew, however, a factfinder could conclude that nitrogen gas would render Bucklew insensate more quickly than pentobarbital and would thus eliminate the risk that he would experience prolonged feelings of choking or suffocation. Dr. Antognini testified that a person who is administered nitrogen gas "would be unconscious very quickly," and that the onset of action from lethal gas "is going to be relatively fast,
 
 just like Pentobarbital's onset
 
 ." R. Doc. 182-5, at 58-59 (emphasis added). Given Dr. Antognini's testimony that pentobarbital would render
 Bucklew insensate within twenty to thirty seconds, the record in the light most favorable to Bucklew supports a finding based on Antognini's testimony that nitrogen gas would relieve Bucklew from any pain of choking or suffocating within twenty to thirty seconds. A trier of fact may accept all, some, or none of a witness's testimony,
 
 United States v. Candie
 
 ,
 
 974 F.2d 61
 
 , 65 (8th Cir. 1992), and a plaintiff may rely on testimony from the defendant's expert to meet his burden if the testimony is advantageous to the plaintiff.
 
 See
 

 IBEW Local 98 Pension Fund v. Best Buy Co., Inc.
 
 ,
 
 818 F.3d 775
 
 , 782 (8th Cir. 2016). If the factfinder accepted Dr. Zivot's testimony as to the effect of pentobarbital, and Dr. Antognini's uncontroverted testimony as to effect of nitrogen gas, then Bucklew's proposed alternative method would significantly reduce the substantial risk of severe pain that the district court identified in its analysis of the first element.
 

 For these reasons, there are genuine disputes of material fact that preclude summary judgment and require findings of fact by the district court. I would therefore remand the case for further proceedings. The district court may then promptly make appropriate factual findings about, among other things, how Bucklew will be positioned during an execution, whether his airway will be blocked during an execution, and how pentobarbital (and, if necessary, nitrogen gas) will affect his consciousness and ability to sense potential pain.
 

 * * *
 

 The State contends that we should not reach the merits of Bucklew's claim because several procedural obstacles require dismissal of his complaint. The majority does not rely on these points, and I find them unavailing.
 

 First, the State contends that Bucklew did not raise his present claim in his fourth amended complaint. Bucklew's complaint, however, does allege the essence of his current theory. The complaint asserts that the tumors in Bucklew's throat require "him to sleep with his upper body elevated" because if he lies flat, "the tumor then fully obstructs his airway."
 
 Id.
 
 at 18-19. It continued: "Executions are conducted on a gurney, and the risks arising from Mr. Bucklew's airway are even greater if he is lying flat. Because of the hemangiomas, Mr. Bucklew is unable to sleep in a normal recumbent position because the tumors cause greater obstruction in that position." R. Doc. 53, at 35. Bucklew further alleged that execution by lethal injection "poses an enormous risk that Mr. Bucklew will suffer extreme, excruciating and prolonged pain - all accompanied by choking and struggling for air."
 
 Id
 
 . at 36. The complaint was adequate under a notice pleading regime to raise a claim that the execution procedure would result in an obstructed airway and choking or suffocation.
 

 If necessary, moreover, the district court acted within its discretion by treating the complaint as impliedly amended to include Bucklew's present claim.
 
 See
 
 Fed. R. Civ. P. 15(b)(2). Bucklew clearly notified the State of his contention in his opposition to the State's motion for summary judgment. R. Doc. 192-1, at 1-3, 11-17. Yet rather than communicate surprise and object that the claim was not pleaded, the State addressed Bucklew's contention on the merits. R. Doc. 200, at 4-5. Where a party has actual notice of an unpleaded issue and has been given an adequate opportunity to cure any surprise resulting from a change in the pleadings, there is implied consent to an amendment.
 
 Trip Mate, Inc. v. Stonebridge Cas. Ins. Co.
 
 ,
 
 768 F.3d 779
 
 , 784-85 (8th Cir. 2014).
 

 Second, the State argues that the five-year statute of limitations bars Bucklew's claim, because he was aware of his claim in
 2008 and did not file his complaint until May 9, 2014. A claim under § 1983 accrues when a plaintiff has "a complete and present cause of action" and "can file suit and obtain relief."
 
 Wallace v. Kato
 
 ,
 
 549 U.S. 384
 
 , 388,
 
 127 S.Ct. 1091
 
 ,
 
 166 L.Ed.2d 973
 
 (2007) (quoting
 
 Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.
 
 ,
 
 522 U.S. 192
 
 , 201,
 
 118 S.Ct. 542
 
 ,
 
 139 L.Ed.2d 553
 
 (1997) ). Bucklew asserts that he did not have knowledge of his present claim, and therefore could not have filed suit and obtained relief, until his medical condition progressed and he was examined by Dr. Zivot in April 2014. As evidence that Bucklew could have brought his claim earlier, the State relies on a 2008 petition that Bucklew submitted to the Missouri Supreme Court. The petition sought funding for an expert witness to investigate the interaction of the State's existing execution protocol with Bucklew's health condition. The possible claim addressed in the 2008 funding petition, however, focused on the potential for uncontrolled bleeding and ineffective circulation of drugs within Bucklew's body under the State's former three-drug execution protocol. The petition does not demonstrate that Bucklew was then on notice of a claim that a future execution protocol using the single drug pentobarbital would create a substantial risk of severe pain resulting from tumors blocking his airway while laying supine during an execution.
 

 Third, the State urges that Bucklew's claim is barred by
 
 res judicata
 
 or claim preclusion, because Bucklew could have litigated his as-applied challenge to the execution protocol in an earlier case styled
 
 Zink v. Lombardi
 
 , No. 12-04209-CV-C-BP. In
 
 Zink
 
 , a group of inmates sentenced to death, including Bucklew, brought a facial challenge to Missouri's execution protocol. A complaint was filed in August 2012, and the eventual deadline for motions to amend pleadings was January 27, 2014. Principles of claim preclusion do not bar Bucklew's as-applied challenge if he was unaware of the basis for the claim in time to include it in the
 
 Zink
 
 litigation.
 
 See
 

 Whole Woman's Health v. Hellerstedt
 
 , --- U.S. ----,
 
 136 S.Ct. 2292
 
 , 2305,
 
 195 L.Ed.2d 665
 
 (2016). The State again points to Bucklew's 2008 funding petition in support of its preclusion defense, but for reasons discussed, that petition does not establish that Bucklew's present claim was available to him in 2008. At oral argument, the State argued that Bucklew could have added his as-applied challenge to the
 
 Zink
 
 litigation after he was examined by Dr. Zivot in April 2014, because the district court granted the
 
 Zink
 
 plaintiffs leave to amend their complaint in May 2014. But the court's order allowed the
 
 Zink
 
 plaintiffs leave to amend only a single count of the complaint to allege a feasible alternative method of execution. The order did not reopen the pleadings deadline for as-applied claims by the several individual plaintiffs.
 
 See
 

 Zink v. Lombardi
 
 , No. 12-04209-CV-C-BP,
 
 2014 WL 11309998
 
 , at *4-5, 12 (W.D. Mo. May 2, 2014). The State therefore has not established that Bucklew's as-applied claim is barred by
 
 res judicata
 
 .
 

 * * *
 

 For these reasons, I would reverse the judgment of the district court and remand for further proceedings to be conducted with dispatch.
 

 Bucklew alleged in Paragraph 128 of his complaint that the State had offered to adjust the gurney so that Bucklew is not lying completely prone, but then continued as follows immediately thereafter: "Although the stated intent was to reduce the choking risk to Mr. Bucklew, the DOC has obtained no imaging studies of Mr. Bucklew since 2010, and therefore has no information on which to base any decisions about the angle of the gurney." R. Doc. 53, at 43-44. The district court noted the State's suggestion "that the execution could be performed with [Bucklew] in a different position," but explained that "there is no evidence whether this has an effect on the procedure as a whole," and concluded that the State had "not provided the Court with a basis for granting summary judgment based on the possibility of performing the execution with [Bucklew] in a sitting (or other) position."