312 F.3d 447
 NORWEST BANK MINNESOTA NATIONAL ASSOCIATION, et al., Appellees,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Appellant.
 No. 01-5435.
 United States Court of Appeals, District of Columbia Circuit.
 Argued October 15, 2002.
 Decided December 10, 2002.
 
 Appeal from the United States District Court for the District of Columbia (00cv01250).
 Barbara R. Sarshik, Counsel, Federal Deposit Insurance Corporation, argued the cause for appellant. With her on the briefs was Colleen J. Boles, Senior Counsel.
 Gloria B. Solomon argued the cause and filed the brief for appellees.
 Before: EDWARDS, RANDOLPH, and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge RANDOLPH.
 RANDOLPH, Circuit Judge:
 
 
 1
 On summary judgment, the district court ruled in favor of Norwest Bank Minnesota National Association,[1] holding that Norwest had overpaid insurance premiums to the Federal Deposit Insurance Corporation and awarding Norwest a refund of $2.8 million, with interest. The overpayments resulted from what the court viewed as the FDIC's misinterpretation of the Federal Deposit Insurance Corporation Improvement Act of 1991. We hold that Norwest's complaint was filed after the expiration of the statute of limitations. We therefore vacate the order of the district court and remand with instructions to dismiss.
 
 I.
 
 2
 In 1989, in response to the savings-and-loan crisis, Congress reformed the national system of deposit insurance, creating two insurance funds under the control of the FDIC: the Bank Insurance Fund ("BIF") to insure banks; and the Savings Association Insurance Fund ("SAIF") to insure savings-and-loan associations. The funds were to be separately funded and administered. Congress anticipated that the BIF would be in stronger financial condition for some time and strictly limited the ability of an insured institution to transfer deposits from one fund to the other fund. An exception was the Oakar Amendment, named after its sponsor, which allowed a member of one fund to acquire a member of the other fund. A SAIF member, after being acquired by a BIF member, would continue to have its acquired deposits insured by the SAIF, while the acquirer's deposits would remain insured by the BIF. The financial institution paid the SAIF rate on part of its deposits and the BIF rate on the remainder of its deposits.
 
 
 3
 To determine the portion of the deposits to be insured by the SAIF, Congress required Oakar institutions to calculate their adjusted attributable deposit amount ("AADA") by adding three components. The first component was (and still is) the amount of deposits acquired from the SAIF bank. 12 U.S.C. § 1815(d)(3)(C)(i). The second component was (and still is) cumulative adjustments made over time using the third component. 12 U.S.C. § 1815(d)(3)(C)(ii). The third component, prior to the 1991 amendments, was the amount the first two components would have increased at a rate of growth equal to the greater of a 7% annual increase or the actual annual rate of growth of deposits of the bank (excluding any deposits acquired by further acquisitions). 12 U.S.C. § 1815(d)(3)(C)(iii) (Supp. II 1990).
 
 
 4
 On December 19, 1991, Congress enacted the Federal Deposit Insurance Corporation Improvement Act, modifying the formula for calculating the AADA. Section 501(a) of the Act eliminated the portion of the third component that provided for a minimum annual increase of 7% and instead provided that the actual annual growth of deposits would be used in all cases. Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102-242, 105 Stat. 2236, 2389 (codified at 12 U.S.C. § 1815(d)(3)(C)(iii)). Section 501(b) provided that the amendment "shall apply with respect to semiannual periods beginning after the date of the enactment of this Act." Id., 105 Stat. at 2391; see also 12 U.S.C. § 1815 note. The dispute over the proper amount of the insurance assessment stems from the parties' disagreement about the meaning of the effective date provision. The FDIC believes that the amendment did not take effect for purposes of calculating Norwest's insurance premiums until 1993. Norwest contends that its actual 1991 growth rate should have been applied to the calculation of premiums beginning in January 1992.
 
 
 5
 Norwest owed premiums to both the BIF and the SAIF as a result of its acquisition of First Minnesota Savings Bank, FSB, in December 1990. In January 1992, it filed the appropriate FDIC form calculating its AADA based on the greater of 7% and its actual growth rate, which was -7%. Applying the pre-1991 calculation method, Norwest calculated its AADA on the appropriate form supplied by the FDIC based on the 7% growth rate, which resulted in an inflated AADA, if Norwest is correct. There was no immediate effect on the total amount of insurance premiums Norwest owed the FDIC because at that time the insurance rates for the BIF and the SAIF were equal.
 
 
 6
 In 1995, the FDIC reduced the BIF assessment rate. The result was that if the FDIC had erroneously interpreted the statute in 1992 to overstate Norwest's AADA, Norwest paid a higher total premium than it should have in 1995 and later years, because deposits that should have been assessed at the preferential BIF rate were assessed at the higher SAIF rate. The error, if any, was preserved by the second component of the formula, § 1815(d)(3)(C)(ii), which carries forward an increase in the AADA and does not allow an error in the growth rate in a given year to be corrected by further changes in a bank's deposit amounts in later years. In addition, there were special assessments based on the amount of deposits assessed at the SAIF rate. Norwest overpaid these amounts as well if it incorrectly calculated its AADA.
 
 
 7
 Norwest disputed the alleged overcharge in a letter to the FDIC dated May 7, 1998, requesting a refund of the overpayment of assessments resulting from the artificially high AADA. The FDIC's Division of Finance denied the request on September 17, 1998, as did the Assessment Appeals Committee on June 2, 1999. Norwest then filed suit against the FDIC in the district court on June 1, 2000, more than eight years after the alleged miscalculation.
 
 
 8
 The district court found Norwest's action timely. Applying the six-year limitations period in 28 U.S.C. § 2401(a),[2] the court measured from the date of the denial by the Assessment Appeals Committee on June 2, 1999. Norwest Bank Minnesota, N.A. v. FDIC, No. 00-1250, slip op. at 6 (D.D.C. Nov. 7, 2000). In the alternative, the court applied the five-year period of 12 U.S.C. § 1817(g),[3] measured from the time of the first alleged overpayment in June 1995. Id.
 
 II.
 
 9
 Norwest and the FDIC agree that the proper statute of limitations for refund claims is 12 U.S.C. § 1817(g), rather than 28 U.S.C. § 2401(a). The six-year statute of limitations — 28 U.S.C. § 2401(a) — is a general, catchall provision for civil actions against the United States. The five-year statute of limitations — 12 U.S.C. § 1817(g) — applies specifically to an action for "the recovery of any amount paid to the [FDIC] in excess of the amount due to it," which precisely describes Norwest's complaint. When both specific and general provisions cover the same subject, the specific provision will control, especially if applying the general provision would render the specific provision superfluous, as it would here. See, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987).
 
 
 10
 Statutes of limitations commonly begin the running of the period from the date the cause of action accrued. 3M Co. v. Browner, 17 F.3d 1453, 1460 (D.C.Cir. 1994); Note, Developments in the Law — Statutes of Limitations, 63 HARV. L. REV. 1177, 1200 (1950). Section 1817(g) is no exception: the triggering event is when "the right accrued for which the claim is made." If, as the FDIC urges, the right of action accrued in January 1992, the five-year period had already run when Norwest sent its letter to the FDIC in May 1998 and when it filed its suit in June 2000.
 
 
 11
 "A claim normally accrues when the factual and legal prerequisites for filing suit are in place." 3M Co., 17 F.3d at 1460; see Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 195, 118 S.Ct. 542, 546, 139 L.Ed.2d 553 (1997); United States v. Lindsay, 346 U.S. 568, 569, 74 S.Ct. 287, 288, 98 L.Ed. 300 (1954); Rawlings v. Ray, 312 U.S. 96, 98, 61 S.Ct. 473, 474, 85 L.Ed. 605 (1941); Oppenheim v. Campbell, 571 F.2d 660, 662 (D.C.Cir. 1978). Section 1817(g) governs not only the time for an "action" in court, but also the time for a "proceeding." We held in 3M with respect to another statute of limitations that a "proceeding" included an administrative proceeding. 3M Co., 17 F.3d at 1455-57. If we followed this line, Norwest's claim accrued when the legal and factual prerequisites for an administrative proceeding were in place. In January 1992, when the alleged miscalculation of Norwest's AADA occurred, Norwest could have requested a refund from the agency or it could have brought suit in court, alleging that the miscalculation resulted in an overpayment to the SAIF. In other words, the legal prerequisites for "an action or proceeding" were then in place. Norwest maintains that at that time a lawsuit or a complaint to the agency would have booted it nothing. In January 1992 the assessment rates for the SAIF and the BIF were the same. And so if Norwest had prevailed in court or in the agency, the FDIC likely would have responded by billing it for the identical amount as an underpayment to the BIF.
 
 
 12
 One might say — the FDIC does — that even if Norwest succeeded in 1992 and wound up with no net recovery, it still would have brought about a determination of the proper construction of the 1991 statutory amendment and the FDIC would have readjusted SAIF and BIF accounts accordingly, not only for Norwest but also for all the other institutions in a similar position. (The FDIC's Assessment Appeals Committee estimated that 75 of the 800 Oakar institutions would be directly affected.) That would have had a future financial impact for the regulated institutions if and when BIF assessment rates were lowered, and it might also have affected when the BIF became fully funded. On the other hand, it is doubtless true that Norwest had no immediate financial incentive to raise the issue in 1992. But the action or proceeding could have been brought then, and it has long been settled that statutes of limitations begin running when the wrong has been committed, even if at the time "no more than nominal damages may be proved, and no more recovered; but on the other hand, it is perfectly clear, that the proof of actual damage may extend to facts that occur and grow out of the injury, even up to the day of the verdict." Wilcox v. Plummer's Ex'rs, 29 U.S. (4 Pet.) 172, 182, 7 L.Ed. 821 (1830).[4]
 
 
 13
 Although the analogy is not perfect, Norwest's complaint is like a claim "for restitution of money paid through mistake." John P. Dawson, Mistake and Statutes of Limitation, 20 MINN. L.REV. 481, 495 (1936). In such cases, courts generally regard the statutory period to begin to run when the payment is made. "Since the payment of money is ordinarily regarded as final, the defendant-payee will probably change his position in reliance upon a reasonable belief that the money is properly his...." Note, 63 HARV. L.REV. at 1214. That, according to the FDIC, is what happened here.
 
 
 14
 One of the policies underlying statutes of limitations is repose. 3M Co., 17 F.3d at 1457. Yet if Norwest's cause of action accrued when BIF and SAIF assessment rates diverged, and gave rise to a claim for each overpayment going back five years from the date of filing the claim — which is Norwest's position[5] — then the FDIC's books would never close. In turn, the integrity and accuracy of the information used to determine the aggregate assessment bases, and therefore the financial health of the insurance systems, would be placed in doubt.
 
 
 15
 Suppose the BIF and SAIF rates remained equal until 2030, then diverged. If Norwest's cause of action would not accrue until then, a suit in 2034 would still be timely. The FDIC would be forced to reallocate retroactively the assessment base by increasing the amount for the BIF and decreasing that of the SAIF for each year of the period, and for each institution affected.
 
 
 16
 The statutory structure — which provides for independence of the two funds[6] — does not treat transfers from one fund to another as insignificant bookkeeping entries. An overpayment to one fund, and the interest on the overpayment in the fund, result in greater reserves for that fund, which inure to the benefit of its member institutions. They pay less in insurance assessments because less money is required to maintain the designated reserve ratio (1.25% of the insured deposits of that fund). 12 U.S.C. § 1817(b)(2)(A)(iv). On the other hand, the members of the fund that is paid too little because of an error might face a special assessment or an increased insurance rate if the fund dips below the designated reserve ratio.
 
 
 17
 A system that allowed a revision many years or decades after an error would cast doubt on all of the data. The FDIC could never be certain it was properly safeguarding the financial health of the funds. Uncertainty might result in overly cautious projections (keeping extra reserves on hand just in case) or other problems for the FDIC, and therefore its regulated financial institutions and their customers.
 
 
 18
 Further, an Oakar bank could hold onto the knowledge that its AADA had been improperly enhanced, and choose to sue years later if the rates went in the direction that disadvantaged it (in this case, SAIF assessment rates higher than those of the BIF). If the rates diverged in the other direction (BIF higher than SAIF), it would be able to choose not to sue and benefit from the previous error. The Oakar bank would be in a no-lose situation, to the detriment of the BIF members whose assessments would be too high each semiannual period.
 
 
 19
 As against this, Norwest will suffer "damage" indefinitely into the future, so long as the SAIF assessment rates remain higher than BIF rates, and so long as it does not divest itself of the former savings-and-loan institution it acquired. Each payment, by its lights, will be an overpayment because the error in 1992 will remain embedded in its adjusted attributable deposit amount. One response, although perhaps not entirely satisfactory, is that Norwest is in the same position as a person permanently disabled from an automobile accident who fails to sue within the period of limitations. That person too will suffer continuing injury that cannot be recompensed because the limitations period has run. Still, we recognize that the result we reach may be seen as strict. But we must also recognize the time-honored standard that "limitations and conditions upon which the Government consents to be sued must be strictly observed." Soriano v. United States, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957).
 
 
 20
 As we have mentioned, Norwest argues that since each assessment is a separate payment, it may recover all payments made within the preceding five-year period, a position that would effectively suspend the running of the limitations period. In support, Norwest invokes Keefe Co. v. Americable Int'l, Inc., 219 F.3d 669 (D.C.Cir.2000) (per curiam). Keefe decided a certified question of District of Columbia law in the context of a private dispute. It did not interpret a federal statute of limitations. At issue were a series of installment payments (equaling a percentage of subscriber revenues) due as compensation for prior assistance obtaining cable television contracts for U.S. military bases. There was no single event that resulted in all future damages. See Keefe Co. v. Americable Int'l, Inc., 755 A.2d 469, 476 (D.C.2000). The District of Columbia Court of Appeals held that the local statute of limitations did not bar an action to recover installment payments that accrued within the limitations period. See id. at 478 (answering the certified question); see also Bay Area Laundry & Dry Cleaning Pension Trust Fund, 522 U.S. at 195, 118 S.Ct. 542 at 546 ("[E]ach missed payment creates a separate cause of action with its own six-year limitations period."). In contrast, here the alleged miscalculation in 1992 of Norwest's AADA was the cause of all of the future overpayments. The D.C. Court of Appeals, in deciding the certified question in Keefe, recognized that the outcome might have been different if there had been a dispute over the interpretation of the contract that would "govern throughout the life of the contract." Id. at 477 (quoting Air Transp. Ass'n of Am. v. Lenkin, 711 F.Supp. 25, 27 (D.D.C.1989), aff'd per curiam on other grounds, 899 F.2d 1265 (D.C.Cir.1990)). In Lenkin, the district court, interpreting District of Columbia law, held that the limitations period for a tenant's claim of overpayment of rent based on the landlord's alleged misinterpretation of a lease provision commenced when the tenant first received notice of the landlord's interpretation. Lenkin, 711 F.Supp. at 27. The statute of limitations barred the complaint even though further payments would be incorrectly inflated, if the tenant's interpretation was correct. Id.
 
 
 21
 Norwest also seeks to extend the period of limitations on the ground that the six-year period of limitations in the general statute (28 U.S.C. § 2401(a)) only started running in 1999, after the FDIC finally rejected its refund claim, so that if it sued for a refund within six years of that date it was entitled to recover all overpayments within six years of its suit. This cannot possibly be right. Norwest initiated no administrative action until May 1998, when it requested a refund in a letter to the FDIC. By then the limitations period had already expired. If Norwest's claim was untimely, as we have determined it was, the FDIC's rejection of the claim could not make it timely. Norwest relies upon Sendra Corp. v. Magaw, 111 F.3d 162 (D.C.Cir.1997), for the proposition that when an agency reopens a matter it creates a right of judicial review. But we cannot see how the FDIC Assessment Appeals Committee's decision to treat the claim for a refund on the merits, while noting in a footnote that it appeared to be untimely under § 1817(g), somehow waived the statute of limitations defense in judicial proceedings.
 
 
 22
 The district court's judgment in favor of Norwest cannot stand because the complaint was filed after the expiration of the five-year statute of limitations provided by 18 U.S.C. § 1817(g). The judgment of the district court is vacated and the case is remanded with instructions to dismiss because the action was untimely.
 
 
 23
 
 So ordered.
 
 
 
 
 Notes:
 
 
 [1]
 Plaintiff is now known as Wells Fargo Bank Minnesota National Association. For the sake of consistency with the district court's orders in this case, we will continue to refer to it as Norwest
 
 
 [2]
 "Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action accrues." 28 U.S.C. § 2401(a)
 
 
 [3]
 "No action or proceeding shall be brought... for the recovery of any amount paid to the Corporation in excess of the amount due to it, unless such action or proceeding shall have been brought within five years after the right accrued for which the claim is made...." 12 U.S.C. § 1817(g)
 
 
 [4]
 We have recognized, as have other courts, limited exceptions to the general rule that the statute of limitations begins to run at the time of the wrong. If the injuries are latent, as for example after an exposure to toxic chemicals, the right to sue is deemed to accrue when the wrong manifests itself in injury to the plaintiff. We adopted this "discovery rule" inConnors v. Hallmark & Son Coal Co., 935 F.2d 336, 342 (D.C.Cir.1991). But here nothing prevented Norwest from learning in 1992 that its AADA may have been overstated, thus resulting in an overpayment to the SAIF. As we stated in Connors, "if the injury is such that it should reasonably be discovered at the time it occurs, then the plaintiff should be charged with discovery of the injury, and the limitations period should commence, at that time." Id.
 
 
 [5]
 Norwest argues that each overpayment creates a new cause of action, and so long as a suit for a particular overpayment is commenced within five years after overpayment, it is timely. Br. of Appellee at 28-29
 
 
 [6]
 For example, 12 U.S.C. § 1821(a)(4)(A)(ii) provides that the funds shall be "maintained separately and not commingled." The FDIC is required to set the insurance rates such that the reserve ratio of 1.25% (or a higher percentage as may be determined) is maintained for each fund to cover future failures of financial institutions insured by that fundSee 12 U.S.C. § 1817(b)(2)(A)(i), (iv).