# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 16, 2009        Decided January 12, 2010

No. 08-1365

CORE COMMUNICATIONS, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

EARTHLINK, INC., ET AL.,
INTERVENORS

———

Consolidated with 08-1393, 09-1044, 09-1046

———

On Petitions for Review of Orders
of the Federal Communications Commission

———

*Michael B. Hazzard* argued the cause for petitioner Core
Communications, Inc. and supporting intervenors. With him
on the briefs were *Joseph P. Bowser*, *Adam D. Bowser*,
*Joshua M. Bobeck*, and *Ross A. Buntrock*.

*Jonathan D. Feinberg* argued the cause for petitioners People of the State of New York and Public Service Commission of the State of New York, intervenors Pennsylvania Public Utilities Commission and the National Association of State Utility Consumer Advocates, and *amicus curiae* Arizona Corporation Commission. On the briefs were *John C. Graham*, *James Bradford Ramsay*, *Robin K. Lunt*, *David Cleveland Bergmann*, *Joseph Kevin Witmer*, and *Maureen A. Scott*.

*Joshua M. Bobeck*, *Ross A. Buntrock*, and *Michael B. Hazzard* were on the brief for intervenors in support of petitioners. *Adam D. Bowser* and *Joseph P. Bowser* entered appearances.

*Joseph R. Palmore*, Deputy General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Richard K. Welch*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel. *Nancy C. Garrison* and *Catherine G. O'Sullivan*, Attorneys, U.S. Department of Justice, and *Daniel M. Armstrong III*, Associate General Counsel, Federal Communications Commission, entered appearances.

*Scott H. Angstreich* argued the cause for intervenors in support of respondents. With him on the brief were *Michael K. Kellogg*, *Kelly P. Dunbar*, *Michael E. Glover*, *Karen Zacharia*, *Christopher M. Miller*, *Gary L. Phillips*, *John T. Nakahata*, *Carl W. Northrop*, *Stephen B. Kinnaird*, *Timothy J. Simeone*, *Joseph C. Cavender*, and *John E. Benedict*. *Robert B. McKenna Jr.* entered an appearance.

Before: SENTELLE, *Chief Judge*, WILLIAMS AND RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: When a customer accesses the internet via "dial-up," his or her call goes to a local exchange carrier ("LEC"), which commonly hands the call off to another LEC, which in turn connects the customer to an internet service provider ("ISP").[1] The ISP links the customer to the web. At least as early as 1999 the Federal Communications Commission was concerned that the regulatory procedures under which the sending LEC compensated the recipient LEC were leading to the imposition of excessive rates, and that these rates in turn were distorting the markets for internet and telephone services. The Commission in due course responded with an alternative regulatory regime, principally taking the form of rate caps set well below the rates that had prevailed before.

In the order under review here, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Developing a Unified Intercarrier Compensation Regime, Intercarrier Compensation for ISP-Bound Traffic* (CC Docket Nos. 96-45, 96-98, 99-68, 99-200, 01-92), FCC 08-262, __ FCC Rcd __ (Nov. 5, 2008) (the "*Order*"), the Commission has set forth the basis of its authority to institute the rate cap system, namely, 47 U.S.C. § 201. That section (excerpted in an appendix to this opinion) requires that the charges of "every common carrier engaged in interstate or foreign

---

[1] Data in the record suggest that dial-up, though being rapidly replaced by various forms of higher-speed service, still accounts for a non-trivial share of internet access: about 20.4% in 2007, 10.5% in 2009, and (a prediction, obviously) 4.6% in 2014. Joint Appendix 102.

communication by wire" for "such communication service" be "just and reasonable," and authorizes the Commission to "prescribe such rules and regulations as may be necessary . . . to carry out the provisions of this chapter." *Id*. Petitioners assail the Commission's analysis on a variety of grounds, most powerfully on the theory that §§ 251-252 of Title 47, added by the Telecommunications Act of 1996, Pub.L. No. 104-104,110 Stat. 56, 47 U.S.C. §§ 151-714 (the "1996 Act"), withdraw from the Commission whatever support § 201 might have afforded its rate cap decision. Finding no legal error in the Commission's analysis, we affirm its order.

* * *

Before the FCC imposed a rate cap system, rates for the transfer of calls from an originating LEC to the ISP's LEC were governed, in practice, by the "reciprocal compensation" provisions of the 1996 Act. That act, in the interest of opening the telephone market to competition, had imposed a number of obligations on all local exchange carriers, including a duty to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). Reciprocal compensation arrangements require that when a customer of one carrier makes a local call to a customer of another carrier (which uses its facilities to connect, or "terminate," that call), the originating carrier must compensate the terminating carrier for the use of its facilities. See *In re Core Communications, Inc.*, 455 F.3d 267, 270 (D.C. Cir. 2006) ("*Core 2006*"). Subsection 251(c) imposes extra duties on "incumbent local exchange carriers" ("ILECs"). (ILECs are a subset of LECs, comprising mainly the Bell Operating Companies that succeeded to the local operations of AT&T on the occasion of the latter's dissolution as a result of an antitrust settlement. See *United States v. AT&T*, 552 F.Supp. 131 (D.D.C. 1982). "Competitive local

exchange carriers" ("CLECs") constitute the remainder of the LEC universe.) Among the § 251(c) obligations is a "duty to negotiate in good faith in accordance with [§ 252] the particular terms and conditions of agreements to fulfill the duties described in" § 251(b), including the reciprocal compensation obligations, and to provide interconnection with its own "network" for requesting telecommunications carriers. 47 U.S.C. § 251(c). Section 252 allows ILECs to satisfy their § 251 obligations by privately negotiating terms with CLECs, but also grants parties the right to refer the negotiations to state commissions for mediation or arbitration.

The *Order* arises out of the Commission's concern with the results of applying the reciprocal compensation system to ISP-bound traffic, a concern perhaps most clearly expressed in an order responding to our initial remand of the matter:

> Because traffic to ISPs flows one way, so does money in a reciprocal compensation regime . . . . It was not long before some LECs saw the opportunity to sign up ISPs as customers and collect, rather than pay, compensation because ISP modems do not generally call anyone. . . . In some instances, this led to classic regulatory arbitrage that had two troubling effects: (1) it created incentives for inefficient entry of LECs intent on serving ISPs exclusively and not offering viable local telephone competition, as Congress had intended to facilitate with the 1996 Act; (2) the large one-way flows of cash made it possible for LECs serving ISPs to afford to pay their own customers to use their services, potentially driving ISP rates to consumers to uneconomical levels.

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 16 FCC Rcd 9151 (2001) (the "*ISP Remand Order*") ¶ 21.

The Commission's first step into this arena was its issuance of *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Inter-carrier Compensation for ISP-Bound Traffic*, 14 FCC Rcd 3689 (1999) ("*Declaratory Ruling*"). There it applied its so-called "end-to-end" analysis (as it does in the order under review), under which the classification of a communication as local or interstate turns on whether its origin and destination are in the same state. Because a customer's venture into the web characteristically reaches servers out of state (and often out of the country), the Commission concluded that under the end-to-end principle dial-up internet traffic was interstate. *Id.* ¶ 18. As such traffic was "jurisdictionally mixed," *id.* ¶ 19, however, the Commission chose not to disturb state commissions' application of interconnection agreements to that traffic "pending adoption of a rule establishing an appropriate interstate compensation mechanism," *id.* at ¶ 21. In review of the order in *Bell Atlantic Tel[]. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000), we found the Commission's conclusions in apparent conflict with various prior statements, and possibly with the statute; we vacated the order and remanded the matter for its further analysis. *Id.* at 9.

On remand the Commission instituted substantially the same rate cap system that it defends here. See *ISP Remand Order* ¶ 8. But it claimed as supporting authority 47 U.S.C. § 251(g), which required LECs to comply with certain FCC regulations promulgated prior to the enactment of the 1996 Act. In *WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C. Cir. 2002), we rejected that claim, finding that § 251(g) was "worded simply as a transitional device" and thus could not be relied on for authority to promulgate new regulations. *Id.* at 430. Recognizing that the Commission's rules might well have other legal bases, however, we did not vacate the order. *Id.* at 430, 434.

Between the *ISP Remand Order* and the present *Order* there have been several additional visits to our court. In July 2003 Core Communications, Inc. ("Core") petitioned the FCC to forbear from enforcing its rate caps and associated provisions, a petition that the FCC partly granted. *Petition of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) from Application of the ISP Remand Order*, 19 FCC Rcd 20179, ¶¶ 23-24, ¶ 27 (2004). We upheld the order against challenges by both CLECs and ILECs. *Core 2006*, 455 F.3d 267.

In June 2004 Core filed a petition seeking mandamus requiring the FCC to respond to the *WorldCom* remand. Based on the FCC's representations about its efforts to meet the remand, we denied Core's petition "without prejudice to refiling in the event of significant additional delay." *In re: Core Communications, Inc.*, No. 04-1179 (D.C. Cir. May 24, 2005). In October 2007 Core filed a second petition, which we granted, "direct[ing] the FCC to explain the legal basis for its ISP-bound compensation rules within six months of" May 5, 2008. *In re Core Communications, Inc.*, 531 F.3d 849, 850 (D.C. Cir. 2008) ("*Core 2008*").

On the last permissible day, November 5, 2008, the FCC released the current *Order*. Petitions for review followed, filed by Core and by Public Service Commission of the State of New York and National Association of Regulatory Utility Commissioners (the "state petitioners"); we consolidated the petitions.

\* \* \*

As we noted at the outset, the Commission relies primarily on § 201 for its authority to regulate ISP-bound traffic. See *Order* ¶ 21. That section prohibits carriers

engaged in the delivery of interstate communications from charging rates that are not "just and reasonable," and grants the FCC authority to prescribe regulations to implement the 1934 Act, which include all provisions of the 1996 Act. See *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377-78 (1999) (observing that "Congress expressly directed that the 1996 Act . . . be inserted into the Communications Act of 1934" and holding that "the grant in § 201(b) means . . . [that] [t]he FCC has rulemaking authority to carry out the 'provisions of this Act,' which include §§ 251 and 252"). A savings clause attached to § 251, namely § 251(i), fortifies the Commission's position, providing: "Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201." Further, all parties agree that the familiar principles of *Chevron USA v. Natural Resources Defense Council*, 467 U.S. 837 (1984), apply to the FCC's construction of the Communications Act. State Pet'rs Br. 8; Core Pet'r Br. 27-28; Resp. Br. 19-20. Finally, except as discussed below, the petitioners accept the end-to-end analysis and its application to ISP-bound calls, as announced by the Commission in the *Declaratory Ruling* in 1999 (described above) and restated in the *Order*, ¶ 21 & n.69.

Against the Commission's reliance on § 201, petitioners claim that "Congress's specific choice" on the matter of inter-LEC compensation, manifested in §§ 251-252, must trump the FCC's "general rulemaking authority under section 201." Core Interv. Br. 18. They cite *Norwest Bank Minnesota National Association v. FDIC*, 312 F.3d 447, 451 (D.C. Cir. 2002), for the "cardinal rule of statutory construction . . . that where both a specific and a general provision cover the same subject, the specific provision controls." State Pet'r Br. 27.

But it is inaccurate to characterize § 201 as a general grant of authority and §§ 251-252 as a specific one. "When . . . two statutes apply to intersecting sets . . . , neither is more

specific." *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 264 (7th Cir. 1998). That is the case here. Not all inter-LEC connections are used to deliver interstate communications, just as not all interstate communications involve an inter-LEC connection. A local call to chat with a schoolmate about the evening's homework would not—at least under conditions typical today—involve interstate communications; and a conventional interstate long distance call, while it will usually involve interconnection between the long distance provider and a LEC, will often not involve two LECs connecting directly with each other. And, as to a LEC's provision of access for completion of a long-distance call, the parties agree that the link between the LEC and the interexchange carrier is *not* governed by the reciprocal compensation regime of § 251(b)(5). See State Pet'rs Br. 25-26 (citing *Global NAPS, Inc. v. Verizon New England*, 444 F.3d 59, 62-63 (1st Cir. 2006), in turn quoting the FCC's *Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499 (1996).

Dial-up internet traffic is special because it involves interstate communications that are delivered through local calls; it thus simultaneously implicates the regimes of both § 201 and of §§ 251-252. Neither regime is a subset of the other. They intersect, and dial-up internet traffic falls within that intersection. Given this overlap, § 251(i)'s specific saving of the Commission's authority under § 201 against any negative implications from § 251 renders the Commission's reading of the provisions at least reasonable.

Petitioners next argue that because the call to the ISP terminates locally, the FCC's authority over interstate communications is inapplicable. State Pet'r Br. 30-33. Section 251(b)(5) applies to "reciprocal compensation arrangements for the transport and termination of telecommunications." Petitioners point to the FCC's

definition (in the *Order*) of "terminat[ion]" as "the switching of traffic that is subject to Section 251(b)(5) at the terminating carrier's end office switch . . . and delivery of that traffic to the called party's premises." See *Order* ¶ 13; see also 47 C.F.R. § 51.701(d). State Pet'rs Br. 31-32. Because the "called party" in the case of dial-up Internet traffic is the ISP, petitioners say, the § 251(b)(5) telecommunications "terminat[e]" locally and thus the FCC cannot apply its § 201 authority over these communications.

This argument fails because it implicitly assumes inapplicability of the end-to-end analysis, which petitioners have not challenged. And the FCC has consistently applied that analysis to determine whether communications are interstate for purposes of § 201. Petitioners do not dispute that dial-up internet traffic extends from the ISP subscriber to the internet, or that the communications, viewed in that light, are interstate. Given that ISP-bound traffic lies at the intersection of the § 201 and §§ 251-252 regime, it has no significance for the FCC's § 201 jurisdiction over interstate communications that these telecommunications might be deemed to "terminat[e]" at a LEC for purposes of § 251(b)(5).

Petitioners also appear indirectly to invoke the 8th Circuit's conclusion that while the FCC has authority to impose a *methodology* on state commissions' exercise of power under § 252 (they specifically note "total element long-run incremental cost" ("TELRIC")), it has (for certain purposes) no power to set actual prices. See State Pet'rs Br. 33, citing *Iowa Utils. Bd. v. FCC*, 219 F.3d 744, 757 (8th Cir. 2000). We take no position on the issue before the 8th Circuit. It reached its finding for purposes quite different from the present subject (FCC ratesetting authority for a leg of an interstate communication), and it did not address the FCC's power to implement "just and reasonable" rates under § 201 or how that power was affected by §§ 251-252.

Petitioners further argue that it was "arbitrary and capricious" for the FCC to "discriminate" against dial-up internet traffic by requiring that LECs be compensated pursuant to the rate cap regime when terminating such traffic, but otherwise in accordance with state commissions' application of the FCC's TELRIC methodology. Core Pet'r Br. 43-47; Core Interv. Br. 22-23. See 5 U.S.C. § 706(2)(A). Our review under the arbitrary and capricious standard is narrow. See *Core 2006*, 455 F.3d at 277. Here the agency action passes handily.

The Commission has provided a solid grounding for the differences between the treatment of inter-LEC compensation for delivery of dial-up internet traffic and the regime generally applicable to inter-LEC compensation under § 251(b)(5). (We assume *arguendo* that the concept of discrimination is relevant to regimes created under entirely different statutory provisions.) In the context to which reciprocal compensation is ordinarily applied, it noted, outgoing calls are generally balanced by incoming ones, so that it matters relatively little how accurately rates reflect costs. *ISP Remand Order* ¶ 69. Such balance is utterly absent from ISP-bound traffic. Moreover, it found that in fact the rates for such traffic were so distorted that CLECs were in effect paying ISPs to become their customers. *Id*. ¶ 70 & n.134; see also *id*. ¶ 21. To the extent that ILECs simply passed the costs on to their customers generally (rather than having a separate charge for those making ISP-bound calls), they would force their non-internet customers to subsidize those making ISP-bound calls, and the system would send inaccurate price signals to those using their facilities for internet access (in effect the ISPs and their customers) and to those not doing so. *Id*. ¶¶ 68, 87. On the other hand, the Commission believed that its "failure to act . . . would lead to higher rates for Internet access, as ILECs seek to recover their reciprocal compensation liability . . . from their customers to call ISPs," *id*. ¶ 87, presumably

meaning rates "higher" than cost, correctly computed. Thus the continued application of the reciprocal compensation regime to ISP-bound traffic would "undermine[] the operation of competitive markets." *Id.* ¶ 71.

Core purports to find a discrepancy between our mandamus order and the Commission's response. Our order required the FCC to "explain[] the legal authority for the Commission's interim intercarrier compensation rules that exclude ISP-bound traffic from the reciprocal compensation requirement of § 251(b)(5)." *Core 2008*, 531 F.3d at 862. The *Order*, en route to finding that § 201 authorized the Commission to impose its rate cap system on the communications in question, also expressed its view that they *were* "subject to the reciprocal compensation regime in sections 251(b)(5) and 252(d)(2)." *Order* ¶15; see also *id.* ¶ 16. Core claims that in so finding the Commission violated our mandate.

In context it is perfectly plain that our order sought simply to have the FCC explain the reasoning underlying its exercise of authority, not to preempt its analytical route. The sort of argument made by Core here gives pettifoggery a bad name.

Finally, we note the presence of a number of arguments introduced outside of the petitioners' opening briefs. Core intervened in the appeal filed by the state petitioners before we consolidated its separate appeal with the latter. Together with other intervenors, Core filed a brief raising a number of arguments that it did not raise as petitioner. As we explained in *Illinois Bell Telephone Company v. FCC*, 911 F.2d 776 (D.C. Cir. 1990), "An intervening party may join issue only on a matter that has been brought before the court by another party." *Id.* at 786 (emphasis added). While we acknowledged in *Synovus Financial Corporation v. Board of Governors*, 952

F.2d 426 (D.C. Cir. 1991), that this rule is prudential and "should not be applied categorically," the grounds that *Synovus* mentioned for making exceptions are absent here. *Id.* at 434. *Synovus* allowed an intervenor who lacked incentive to petition for review of the administrative action to present an additional issue that was "an essential predicate to [a] question" raised by petitioners. *Id.* at 434 (internal quotes omitted). But Core not only had an incentive to petition for review itself but did so. See *United States Telephone Association v. FCC*, 188 F.3d 521, 531 (D.C. Cir. 1999) (noting that intervenors not only failed to qualify for the *Synovus* exception but "present[ed] no reason why it could not have petitioned in its own right"). And the issues Core raises as intervenor bear "no substantive connection" to the challenges petitioners raise in their initial briefs. *Synovus*, 952 F.2d at 434; Cir. Rule 28(d)(2). Accordingly, we do not consider the new arguments Core raises as intervenor. Similarly, we do not consider arguments that first appear in petitioners' reply briefs. See, e.g., *Bd. of Regents of the Univ. of Washington v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996) ("By failing to make any specific objection until their reply brief, petitioners deprived the [respondents] of the opportunity to respond. To prevent this . . . , we have generally held that issues not raised until the reply brief are waived.").

* * *

The petitions for review are

*Denied.*

Appendix: Text of 47 U.S.C. § 201

§ 201. Services and Charges.

(a) It shall be the duty of every *common carrier engaged in interstate or foreign communication by wire or radio* to furnish such communication service upon reasonable request therefore; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) *All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable*, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications . . . . *The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter*.

47 U.S.C. § 201 (emphasis added).